**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

_____

|  |  |  |
|---|---|---|
| | * | |
| BRANDON CAIRE | * | |
| | * | |
| v. | * | Civil Case No.: 13 CV 1216 (RDB) |
| | * | |
| CONIFER VALUE-BASED CARE, | * | |
| LLC, *et al.* | * | |
| | * | |
| Defendants. | * | |
| | * | |

_____

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE MOTIONS TO COMPEL ARBITRATION, OR IN THE ALTERNATIVE, MOTIONS TO DISMISS FILED BY DEFENDANT JANET CAMP (ECF NO. 10) AND DEFENDANT CONIFER VALUE-BASED CARE LLC (ECF NO. 11)

Respectfully Submitted,


_____/s/_____
Ruth Ann Azeredo, Esq. (MD 16175)
Law Office of Ruth Ann Azeredo LLC
1997 Annapolis Exchange Parkway
Suite 300
Annapolis, MD  21401
(410) 558-1915
(410) 558-1917 Fax
Email:  ruthazeredo@comcast.net
Counsel for Plaintiff, Brandon Caire

# TABLE OF CONTENTS

**PROCEDURAL HISTORY** ................................................................4

**INTRODUCTION** ........................................................................5

**FACTS** ......................................................................................8

**ARBITRATION LANGUAGE AT ISSUE** ...................................13

**STANDARD** .............................................................................14

**ARGUMENT** ............................................................................15

I.    THIS COURT HAS JURISDICTION TO DETERMINE WHETHER THE ARBITRATION PROVISIONS, AS A WHOLE, ARE UNENFORCEABLE BASED ON CONTRACT FORMATION CONSIDERATIONS UNDER MARYLAND LAW .....................15

II.    THE ARBITRATION PROVISIONS ARE NOT SUPPORTED BY MUTUAL CONSIDERATION ..................................................17

    A.    Overview .....................................................................17

    B.    Continued Employment is Not Adequate Consideration Under Maryland Law ....................................................18

    C.    The Arbitraton Policy Does Not Mutually Bind Both Parties .........19

    D.    InforMed's Unilateral Discretion to Alter the Arbitration Policy Renders it Illusory and Unenforceable ...............21

III.    THE ARBITRATION PROVISIONS AT ISSUE ARE ADDITIONALLY UNENFORCEABLE ON A HOST OF OTHER GROUNDS APART MUTUALITY AND CONSIDERATION ..................................22

    A.    Overview .....................................................................22

    B.    There Has Been No Agreement on the Essential Terms of Arbitration .....23

    C.    InforMed's Arbitration Policy is Procedurally Unconscionable .................24

D.       InforMed's Arbitraton Policy is Sustantively Unconscionable ....................26

         1.      Unconscionable Representations Regarding
                Time Limits for Arbitration .............................................27

         2.      Unconscionable Provisions Regarding the Selection
                of an Arbitrator and Waiver of All Rights for
                Failing to Respond Within Fourteen Days ..........................28

         3.      Unconscionable Allocation of Arbitration Costs ...................30

         4.      InforMed has Unconscionably Truncated the
                Statute of Limitations .....................................................33

         5.      Severability ..................................................................34

IV.    MR. CAIRE HAS PLED CLAIMS FOR DISABILITY DISCRIMINATION
       UNDER THE ADA AND MHRS SUFFICIENT TO SURVIVE A MOTION
       TO DISMISS ............................................................................35

     A.      Overview .........................................................................35

     B.      Mr. Caire Has Sufficiently Pled the Elements of a Plausible ADA
          Discharge Claim ................................................................36

         1.      Mr. Caire is an Individual within the ADA's Protected Class .......36

         2.      Mr. Caire has Plausibly Pled that his Discharge Occurred Under
                Circumstances that Raise a Reasonable Inference of
                Discrimination ...............................................................39

V.     MR. CAIRE HAS PLED AN INDIVIDUAL FMLA CLAIM  AGAINST
       MS. CAMP  SUFFICIENT TO SURVIVE A MOTION TO DISMISS ................42

CONCLUSION .................................................................................45

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | |
|---|---|
| BRANDON CAIRE | * |
| | * |
| v. | *    Civil Case No.: 13 CV 1216 (RDB) |
| | * |
| CONIFER VALUE-BASED CARE, | * |
| LLC, *et al.* | * |
| | * |
| Defendants. | * |
| | * |

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO THE MOTIONS TO COMPEL ARBITRATION, OR IN THE ALTERNATIVE, MOTIONS
TO DISMISS FILED BY DEFENDANT JANET CAMP (ECF NO. 10) AND DEFENDANT
CONIFER VALUE-BASED CARE LLC (ECF NO. 11)**

Plaintiff, Brandon Caire ("Mr. Caire"), by and through his undersigned counsel, hereby submits this Memorandum in Opposition to the Motion to Compel Arbitration, or in the alternative, Motion to Dismiss filed by Defendant Janet Camp filed on June 6, 2013 (*See* ECF Docket No. 10), as well as the Motion to Compel Arbitration, or in the alternative, partial Motion to Dismiss filed by Defendant Conifer Value-Based Care on June 10, 2013. (ECF Docket No. 11).[1]  For the reasons set forth below, the relief sought by both Defendants should be denied in its entirety and this case should be permitted to proceed in this Court on the merits.

**PROCEDURAL HISTORY**

Mr. Caire is a former employee of InforMed, now known as Conifer Value-Based Care, LLC ("Conifer" or "InforMed"), who worked as an entry level customer service representative ("CSR") for

---

[1]    The motions filed by Ms. Camp and Conifer Value-Based Care are nearly identical, at least in terms of the Motion to Compel Arbitration.  For ease of economy and to avoid confusion, Mr. Caire is filing the instant Opposition which opposes both of Defendants' motions.

InforMed in its national Call Center, located in Annapolis, Maryland, from October 4, 2010 until his involuntary termination on February 1, 2012.

After exhausting his administrative remedies, Mr. Caire initiated the present suit on or about April 24, 2013, by filing a Complaint against Conifer[2] alleging illegal discrimination/retaliation in the terms, conditions, and discharge of his employment arising under the Family and Medical Leave Act ("FMLA"), the Americans with Disabilities Act ("ADA"), the Maryland Human Relations Statute, ("MHRS"), and the Maryland Wage Payment and Collection Law ("MWPCL").  Mr. Caire is additionally asserting an individual claim against Janet B. Camp, in addition to a declaratory judgment and relief from an unconscionable and unenforceable arbitration provision pursuant to both the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., and the Maryland Uniform Declaratory Judgment Act, MD. CODE ANN., CTS. & JUD. PROC. §§3-401, *et seq*.  (ECF Docket No. 1).

Following proper service of the summons and Complaint, individual defendant Janet Camp ("Ms. Camp") filed a Motion to Compel Arbitration, or in the alternative, Motion to Dismiss on June 6, 2013. (*See* ECF Docket No. 10).  Conifer, for its part, filed a Motion to Compel Arbitration, or in the alternative, a partial Motion to Dismiss just four days later on June 10, 2013. (*See* ECF Docket No. 11).  On or about June 11, 2013, counsel for the parties held a brief telephone conference with the Honorable Judge Bennett regarding this case.

## <u>INTRODUCTION</u>

The arbitration provisions at issue here, arbitration provisions that were imbedded in several locations within an employee manual, are unenforceable for many reasons.  The overarching and

---

[2]   The Complaint also named Conifer Health Solutions LLC as a party Defendant in this case.  Plaintiff will be dismissing, without prejudice, Conifer Health Solutions LLC from the instant action.

fundamental problem with these provisions which purport to be an arbitration agreement is that they lack consideration and mutuality.  These provisions, not only are poorly drafted but they are one sided, lack essential material terms necessary for contract formation, and are bereft of independent consideration and mutuality.

Not only are these arbitration provisions devoid of necessary elements to contract formation and enforcement due to the lack of consideration and mutuality, but, additionally,  they were foisted upon Mr. Caire under circumstances that render it a contract of adhesion.  Moreover, the arbitration provisions (i) fail to specify an arbitrator or ADR provider; (ii) fail to warrant that the arbitrator(s) will be neutral or impartial; (iii) fail to contain any procedure or safeguard for the parties to challenge or contest an arbitrator; (iv) fail to contain any mechanism to ensure arbitration will go forward in the event the parties are unable to agree upon the selection of an arbitrator; (v) fail to set forth the applicable rules governing arbitration; and (vi) do not specify a location for arbitration or the governing law applicable to such proceedings.

Critical here, is that the arbitration provisions do not contain independent consideration and lack mutuality and are altogether foreclosed in light of relevant law. Two important and controlling decisions that are squarely applicable here, and adverse to Defendants' position, <u>Cheek v. United Healthcare of Mid-Atlantic, Inc.</u>, 835 A.2d 656 (Md. 2003) and <u>Noohi v. Toll Bros, Inc.</u>, 708 F.3d 599 (4th Cir. 2013), provide the requisite structure and elements for this court to consider in determining the enforceability of the arbitration provisions.  These decisions, not disclosed to this Court by Defendants, should lead this Court to conclude that the arbitration provisions are not enforceable and that, therefore, the proper forum for adjudicating the underlying dispute is with this Court.

6

Substantively, the allegations in this case present a textbook example of discriminatory discharge under the FMLA and ADA, and also illuminate that Mr. Caire was terminated for an assortment of pretextual reasons just two days after going on approved FMLA leave.  Ignoring the well pled and thorough allegations in the Complaint, InforMed has alternatively moved to dismiss several counts.

In moving to dismiss Counts III and IV, InforMed does not challenge Mr. Caire's FMLA claim, but raises a contorted argument which is that the ADA and MHRS claims must fail because Mr. Caire's use of FMLA leave rendered him unable to work and effectively precluded him from performing the "essential functions" of his job.  Even at the pleading stage, Mr. Caire has been able to rebut, point by point, the pretext underlying Defendants' unlawful termination decisions, so much so that Defendants' actually concede in their memoranda that the reasons for Mr. Caire's discharge "**are obviously in dispute**." (Conifer Memo, p. 4, fn. 2).

Finally, Ms. Camp, in her individual capacity, seeks dismissal of the FMLA claim against her on the basis that she arguably did not have the authority to hire or fire Mr. Caire, despite the fact that Ms. Camp authored and signed the letter terminating Mr. Caire, and thereafter interacted and corresponded with him concerning the reasons for his discharge.  There is individual liability under the FMLA, and Ms. Camp was clearly acting either 'directly or indirectly in the interests' of InforMed sufficient to bind her on an individual basis. *See* 29 C.F.R. §825.104(d).

It is against this background that Mr. Caire now opposes the motions filed by Conifer and Ms. Camp seeking to compel arbitration, or alternatively, seeking the dismissal of Counts III and IV of Mr. Caire's Complaint.

## FACTS

### 'AS TO' THE MOTION TO COMPEL ARBITRATION[3]

1.      Mr. Caire began the hiring process with InforMed in August of 2010.  During the hiring process, no member of InforMed made any mention of binding arbitration, let alone that arbitration would be a condition of prospective employment. (Complaint, ¶ 73).

2.      On September 9, 2010, InforMed forwarded to Mr. Caire a comprehensive offer letter ("Offer Letter"), for the entry level position of CSR, a position which paid an annual salary of $37,000 dollars. (Complaint, ¶¶ 12, 13, 74). (Decl. Caire, Ex. 1, Offer Letter).  In addition to salary, the Offer Letter also addressed available benefit plans, policies, profit sharing, paid time offer, employment classification, who would be Mr. Caire's supervisor, his anticipated hours of work, performance reviews, and other provisions incident to his employment. Id.  The Offer Letter did not contain any reference to an arbitration provision. Id.

3.      The Offer Letter indicated that it was expressly conditioned upon successful completion of a background check, which includes verification of Mr. Caire's social security number, address, driver's license, a credit check, seven year felony check, education verification, and completion of a form SF86 promulgated by the Federal Office of Personnel Management.  (Decl. Caire, Ex. 1, Offer Letter).  The Offer Letter indicated that the process of verifying this information would take approximately two weeks. Id.  Although the Offer Letter was conditional, agreeing to an arbitration policy was not a stated condition of employment. Id.

---

[3]   Mr. Caire is setting forth the 'Facts' as they pertain to the Motion to Compel Arbitration, which rely, in part, upon his declaration and supporting exhibits which may be considered by the Court in ruling upon the Motion to Compel.  The 'Facts' pertaining to Defendants' alternative Motion to Dismiss, however, are limited to the allegations set forth in the Complaint and the reasonable inferences which may be drawn from the allegations.

4.      Mr. Caire thereafter signed, accepted and returned the Offer Letter to InforMed. (Complaint, ¶ 74).  In the ensuing weeks, Mr. Caire successfully passed InforMed's background check (Decl. Caire, ¶ 7), and reported for his first day of work at InforMed on October 4, 2010. (Complaint, ¶ 12). At no time between the signing of the Offer Letter and his first day of work was Mr. Caire ever notified that he would be asked to execute an arbitration agreement. (Decl. Caire, ¶ 7).

5.      At some point after he appeared for work on October 4, 2010, Mr. Caire was required to complete several documents verifying his right to work, personal information and the like.  InforMed also provided Mr. Caire with an employee manual and asked him to sign an acknowledgment and receipt of this manual.  Mr. Caire was not afforded the opportunity to review nor negotiate the terms of the employee manual at the time he was asked to sign a generic receipt and acknowledgment, and received no training on the policies and provisions in the document. (Complaint, ¶ 75).(Decl. Caire, ¶ 8).

6.      The arbitration provisions are not separate and apart from the employee manual.  Rather, the arbitration provisions were imbedded on page 13 and 15 of the employee manual and the receipt and acknowledgment on page 4. (Conifer Motion, Ex. 1- Arbitration Policy, p. 13 and Decl. Caire, ¶ 9, Ex. 2 – Pages 13 through 15 of InforMed's Employee Manual).  Because the arbitration provisions are imbedded in the employee manual, InforMed retained the "sole discretion" to "change" the policy "at any time." (Conifer Motion, Ex. 2- Receipt and Acknowledgment).

7.      Mr. Caire was not given any independent economic consideration for submitting to InforMed's arbitration provisions.  (Conifer Motion, Ex. 1- Arbitration Policy); (Decl. Caire, ¶ 9). Further, the Arbitration Policy does not facially indicate that InforMed is also subject and bound to arbitrate disputes. Id.

9

8.      The Arbitration Policy <u>does</u> <u>not</u>: (i) specify an arbitrator or ADR provider; (ii) contain assurances the arbitrator(s) will be neutral, impartial, or familiar with employment disputes; (iii) contain any procedure to safeguard Mr. Caire's rights to challenge or contest an arbitrator; (iv) contain a mechanism to ensure arbitration will go forward in the event the parties are unable to agree upon the selection of an arbitrator; (v) set forth the rules governing the arbitration; and (vi) specify a location for arbitration or the governing law applicable to such proceedings. (Conifer Motion, Ex. 1- Arbitration Policy).

9.      Following Mr. Caire's involuntary termination on February 1, 2012, Ms. Janet Camp, InforMed's Human Resources Director (Conifer Motion, Aff. Camp, ¶ 2), forwarded a letter to Mr. Caire dated February 2, 2012, stating, in part, that: "[y]ou have a right to appeal this termination through our Arbitration Policy as outlined in the InforMed Employee Manual.  However, in order to do so, you must return written notification of your intention to appeal to the Human Resources Department no later than the end of business on Friday, February 17, 2012.  (Decl. Caire, ¶ 9, Ex. 3, Letter Janet Camp 2/2/12).

10.      InforMed's arbitration provisions do not contain language regarding an employee's right to internally appeal a termination decision. (Conifer Motion, Ex. 1- Arbitration Policy).  Further, these provisions do not facially limit an employee's right to seek arbitration to just fifteen days.  <u>Id</u>.  Given this, Mr. Caire forwarded an email to Ms. Camp on February 5, 2012, stating: "I do not feel my termination reason on my letter is accurate with the situation.  Can you please call me when you get the chance? (Decl. Caire, ¶ 10, Ex. 4, Email to Camp 2/5/12).  In response, Mr. Camp forwarded an email which stated:  "[a]s advised in my previous letter, if you wish to appeal your termination, you may do so by writing a letter and sending it to my attention no later than February 17, 2012." (Decl. Caire, ¶ 11,

Ex. 4, Email from Camp 2/6/12).  Ms. Camp also threatened that if Mr. Caire spoke with other employees he would be "subject to legal action" by the company. (Complaint, ¶ 65).

11.     Mr. Caire, through his counsel, attempted to initiate arbitration with the American Arbitration Association ("AAA") in January of 2013. (Complaint, ¶ 84).  On February 14, 2013, InforMed, through their counsel forwarded a letter to the AAA indicating, in part, that Defendants "do not agree to submit the dispute identified by Brandon Caire to the AAA to arbitrate." (Conifer Motion, Ex. 4, letter dated 2/14/13).  This letter also notes InforMed's position that it retains the sole and ultimate authority to reject or "consent" to any arbitrator, even though the provisions contain no process to resolve disputes regarding arbitration.  Id.

12.     Mr. Caire was unemployed for over one year and only recently obtained new employment. (Decl. Caire, ¶ 13).

### 'AS TO' THE MOTION FOR PARTIAL DISMISSAL

13.     Mr. Caire is an individual suffering from depression, major depressive disorder and associated conditions which substantially limit one or more of his major life activities. (Complaint, ¶ 17).  Mr. Caire's supervisor and InforMed's Human Resources Director have long been on notice of his disability, and that he was under the regular treatment of a mental health professional. (Complaint, ¶¶ 19-20).  During his employment, he has missed time due to his disabilities. (Complaint, ¶ 18).

14.     In the fall of 2011, Mr. Caire experienced the loss of both of his grandmothers, traumatic events which served to aggravate and exacerbate his underlying health conditions. (Complaint, ¶ 51).  Following his return to work after the death of his family member, he informed his supervisor that he would need time away from work to deal with his worsening and disabling conditions. (Complaint, ¶ 54).

15.     Ms. Camp began treating Mr. Caire differently when his medical conditions worsened and he notified her that he was expected to miss time from work. (Complaint, ¶ 52).  InforMed is vigilant about time off by employees, particularly those servicing their call-center, and does not look favorably upon employees who miss time away from work due to disabilities. (Complaint, ¶ 67).  In fact, a similarly situated employee named Elaine Long herself had time away from work due to depression and was placed on an adverse employment improvement plan, even though she had a balance of accrued and vested sick leave to use. (Complaint, ¶ 68).

16.     In early January of 2012, Mr. Caire approached Ms. Camp and informed her he was applying for FMLA leave and would be seeking between 1 and 1½ weeks of time off, followed by permissible intermittent leave under the FMLA to address his condition. (Complaint, ¶ 55).  Mr. Caire's physician subsequently filled out FMLA paperwork and a physician's certification which noted, in part, that Mr. Caire in the near future "may" need inpatient hospitalization and "may" need an extended period of time off work due to illness. (Complaint ¶¶ 56-57).

17.     Although Mr. Caire began using his approved leave on January 30, 2012, he was terminated just two days later while on leave. (Complaint ¶¶ 59-62).  Mr. Caire was informed he was terminated for violating InforMed policy by: (1) not installing a "separate telephone line" while telecommuting; (2) using a personal voice greeting on his phone line; and (3) improperly utilizing a portion of his expense allowance for personal use. (Complaint ¶ 63).

18.     Defendants have admitted to the Court that the reasons for Mr. Caire's discharge "**are obviously in dispute**." (Conifer Memo, p. 4, fn. 2)(emphasis added).  In fact, the reasons are in dispute in that Mr. Caire asserts that they are absolutely untrue.  *See e.g.*, Complaint (Rebutting telephone line

Reason ¶¶ 29-32; 40-42, 66); (Rebutting Voice Mail Reason ¶¶ 43-50, 66); (Rebutting Expense Usage

Reason ¶¶ 25-28; 33-35, 65, 66, 72).

## ARBITRATION LANGUAGE AT ISSUE

The governing arbitration language central to the instant dispute is contained in three distinct

places within InforMed's Employee Manual and states the following:

**Arbitration Policy**
If an employment dispute arises while you are employed at InforMed, the company
requests that you agree to submit any such dispute arising out of your employment or the
termination of your employment (including but not limited to, claims of unlawful
termination based on race, sex, age national origin, disability, breach of contract or any
other bias prohibited by law) exclusively under the federal Arbitration Act, 9 U.S.C.,
Section 1.  Similarly, any disputes arising during your employment involving claims of
unlawful discrimination or harassment under federal or states statutes shall be submitted
exclusively to binding arbitration under the above provisions.  This arbitration shall be the
exclusive means of resolving any dispute arising out of your employment or termination
from employment by InforMed or you, and no other action can be brought by employees in
any court or any forum.

By simply accepting or continuing employment with InforMed, you automatically agree
that arbitration is the exclusive remedy for all disputes arising out of or related to your
employment with InforMed and you agree to waive all rights to a civil court action
regarding your employment and the termination of your employment with InforMed; only
the arbitrator, and not a judge or jury, will decide the dispute.

If you decide to dispute your termination or any other alleged incident during your
employment, including but not limited to unlawful discrimination or harassment, you must
deliver written require for arbitration to InforMed within one (1) year from the date of
termination, or one (1) year from the date on which the alleged incident(s) or conduct
occurred, and respond within fourteen (14) calendar days to each communication regarding
the selection or an arbitrator and the scheduling or a hearing.   If InforMed does not receive
a written request for arbitration from you within one (1) year, or if you do not respond to
any communication from InforMed about the arbitration proceedings within fourteen (14)
calendar days, you will have waived any right to raise any claims arising under the
termination of your employment with InforMed, or involving claims of unlawful
discrimination or harassment, in arbitration and in any court or other forum.

You and InforMed shall each bear respective costs for legal arbitration at any such arbitration.  The parties, if any, shall share the cost of the arbitrator and court reporter, equally.

(Conifer Mot., Ex. 1, Arbitration Policy, contained on p. 13 of the Employee Manual)

**Understanding and Acknowledging Receipt of Informed Employee Manual**
I have received and read a copy of the InforMed Employee Manual. I understand that the policies and benefits described in it are subject to change at the sole discretion of InforMed at any time.

         *     *     *     *     *     *     *

**Arbitration**
I also acknowledge that I have read and understand the Arbitration Policy contained in this Employee Manual and I agree to abide by the policy.

(Conifer, Ex. 2, Receipt and Acknowledgment, contained on p. 15 of the Employee Manual)

**Acknowledgment of and Agreement with InforMed Arbitration Policy**
My signature on this document acknowledges I understand the above Arbitration Policy and agree to abide by its conditions.  I also acknowledge that I understand my employment is at-will and may be terminated at any time, with or without reason, by either InforMed or myself.  I further agree that, in accordance with InforMeds' Arbitration Policy I will submit any dispute –including but not limited to my termination—arising under or involving my employment with InforMed to binding arbitration within one (1) year from the date the dispute first arose. I agree that arbitration shall be the exclusive forum for resolving all disputes arising out of or involving my employment with InforMed or the termination of that employment.  I agree I will be entitled to legal representation, at my own cost, during arbitration.  I further understand that I will be responsible for half the costs of the arbitrator and any incidental costs of arbitration.

(Conifer, Ex. 3, Acknowledgment, contained on p. 15 of the Employee Manual)

## STANDARD

"[M]otions to compel arbitration exist in the netherworld between a motion to dismiss and a motion for summary judgment." Shaffer v. ACS Gov't Services, Inc., 321 F.Supp.2d 682, 683-684 (D. Md. 2004).  Whether the motion should be treated as a motion to dismiss or as a motion for summary judgment turns on whether the Court considers documents outside of the pleadings.  Id.

FED. R. CIV. P. 8(a)(2) requires plaintiff to provide only "a short and plaint statement of the claim showing that the [plaintiff] is entitled to relief."  To survive a motion to dismiss, a complaint need only contain "enough facts to state a claim to relief that is plausible on its face" and to "nudge [his or her] claims across the line from conceivable to plausible." Bell Atl. Corp. v. Twombly, 550 U.S. 555, 555-556 (2007). "[D]etailed factual allegations" are not necessary, to provide the "grounds" of "entitle[ment] to relief," Plaintiff only need furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Id.   If the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," then the claim has "facial plausibility."  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992).  Further, "well pleaded factual allegations contained in the complaint are assumed to be true even if they are doubtful in fact."  Sher v. SAF Financial, Inc. 2011 WL 1807697 (D. Md. 2011)(internal quotations omitted).

## ARGUMENT

## I.     THE COURT HAS JURISDICTION TO DETERMINE WHETHER THE ARBITRATION PROVISIONS, AS A WHOLE, ARE UNENFORCEABLE BASED ON CONTRACT FORMATION CONSIDERATIONS UNDER MARYLAND LAW.

At the outset, it is well settled that under the FAA, a challenge to the validity of an arbitration clause is generally to be decided by the court, not an arbitrator.  *See* Buckeye Check Cashing Inc. v. Cardegna, 546 U.S. 440 (2006).  The only exception to this rule arises in cases in which the parties have expressly agreed to vest the arbitrator with the power to determine questions of enforceability, a

provision which is decidedly <u>not</u> present in this case.[4] As such, there is no dispute that this Court has the authority to initially determine whether the provisions at issue, as a whole, constitute an enforceable agreement to arbitrate.

In determining whether arbitration provisions are unenforceable, the Court is primarily presented with a question of contract interpretation, requiring that the Court give effect to the parties' intentions. <u>Muriithi v. Shuttle Express</u>, 712 F.3d 173, 179 (4th Cir. 2013)(internal citations omitted).   In evaluating a challenge to arbitration, courts apply ordinary state law principles governing the formation of contracts, including principles concerning the "validity, revocability, or enforceability of contracts generally." <u>Id</u>.[5]   In this case, Maryland substantive law governs.   Although the arbitration provisions are silent as to applicable law, the Complaint alleges – and Defendants do not dispute - that Conifer is a company formed and organized under Maryland law, and that at all times relevant to the complaint it maintained its principal place of business in Annapolis, Maryland. (Complaint, ¶ 5).   Mr. Caire worked in Maryland and the alleged unlawful employment actions in question took place in Maryland. (Complaint ¶¶ 11, 12).   Further, the alleged arbitration procedure at issue was contained in an employee manual that was disseminated in Maryland. (Conifer Memo, p. 7).   It is settled that "the law of the

[4]   Such an agreement is informally known as a "delegation provision," which the Supreme Court itself has found to be valid. *See* <u>Rent-A-Center, West, Inc., v. Jackson</u>, 130 S.Ct. 2772, 2779 (2010).  However, given that the arbitration provisions in this matter are very poorly drafted and are miserably infirm, it should come as no surprise that there are no delegation provisions at issue.

[5]   The Court can also apply the federal substantive law of arbitrability, which governs all arbitration agreements encompassed by the FAA.  <u>Muriithi</u>, *supra*, 712 F.3d at 179 (*citing* <u>Hill v. Peoplesoft, USA, Inc.</u>, 412 F.3d 540 (4th Cir. 2005)).  The FAA expressly contains a saving clause which permits arbitration agreements to be declared unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This saving clause permits agreements to be invalidated by generally applicable contract defenses, such as fraud, duress or unconscionability. *See* <u>AT&T Mobility LLC v. Concepcion</u>, 131 S.Ct. 1740, 1746 (2011).

jurisdiction where the contract was made controls its validity and construction" under the *lex loci contractus* principle. Kramer v. Bally's Park Place, Inc., 535 A.2d 466, 467 (Md. 1988). *See also* Chesapeake Bay Foundation, Inc., v. Weyerhaeuser, Co., 848 F.Supp.2d, 570, 578 (D. Md. 2012)(Maryland courts ordinarily apply the law of the jurisdiction where the contract was made). Accordingly, the unenforceability of the arbitration provisions will rise or fall based on Maryland state law contract formation principles.

II. **THE ARBITRATION PROVISIONS ARE NOT SUPPORTED BY MUTUAL CONSIDERATION**

A. Overview

The overwhelming majority of Defendants' supporting memoranda are devoted to the argument Mr. Caire is subject to enforceable and binding arbitration provisions that are altogether supported by adequate consideration under ordinary contract principles.[6] While Defendants have amassed a number of authorities to support their position and though they correctly assert that "…*Maryland decisions on this are authoritative*" (Conifer Memo, p. 8)(emphasis added), it is troubling that they have failed to disclose an adverse controlling decision from the Maryland Court of Appeals in Cheek v. United Healthcare of Mid-Atlantic, Inc., 835 A.2d 656 (Md. 2003), and another recent adverse controlling decision of the Fourth Circuit in Noohi v. Toll Bros, Inc., 708 F.3d 599 (4th Cir. 2013), both of which are apposite in this instance.   These decisions underscore that, notwithstanding a policy favoring arbitration, arbitration

---

[6]    On page 12 of Conifer's supporting memorandum (line 6), Conifer states that "…there is sufficient and **inadequate** consideration…" for the arbitration procedure. (Conifer Memo, p. 12)(emphasis added).  Mr. Caire will presume this was simply a wording error in light of their other arguments.

agreements must contain adequate and independent mutual consideration and the omission of these important decisions from Defendants' motion cannot be ignored.[7]

Contrary to Defendants' suggestion that "[n]one of the terms of the Arbitration Agreement raise an issue with regard to a lack of mutuality" (Conifer Memo, p. 11), the question of mutuality is the most predominant issue confronting this Court.  Recently, the Fourth Circuit in <u>Noohi</u> held that an arbitration agreement must, within its four corners, contain adequate and independent mutual consideration.  <u>Noohi</u>, 708 F.3d at 609 ("[u]nder Maryland law as articulated in <u>Cheek</u>, an arbitration provision must be supported by consideration independent of the contract underlying it, namely, mutual obligation.").  However, here, the arbitration provisions contain no such consideration or mutual obligation.

B.    <u>Continued Employment is Not Adequate Consideration Under Maryland Law</u>.

Ignoring binding precedent, Defendants repeatedly suggest that adequate consideration exists since Mr. Caire "accepted and continued his employment, and the benefits thereof, with full knowledge and consent to this Arbitration Agreement" (Conifer Memo, p. 7), and that "[h]e also continued to work for one-and-a-half years with the Arbitration Policy in effect." (Conifer Memo, p. 8, fn. 4).  Without limitation, Defendants' assertion that Mr. Caire's 'employment' or 'continued employment'[8] constitutes

---

[7] The Fourth Circuit decision in <u>Noohi,</u> in particular, was decided more than three months prior to Defendants' motions and, yet, was not cited or addressed by them.  Defendants did, however, cite a very recent Fourth Circuit decision – <u>Muriithi v. Shuttle Express, Inc.,</u> 712 F.3d 173 (4th Cir. April 1, 2013).  (See Defs Memo, p. 12).  Similarly, Defendants rely heavily on <u>Walther v. Sovereign Bank</u>, 386 Md. 412 (2005) which quotes the decision in <u>Cheek</u> numerous times, yet, <u>Cheek</u> is not addressed.

[8]    Although it is ultimately a distinction without a difference on this point, Mr. Caire altogether disputes Defendants' claim that he "accepted" arbitration as a formal condition of being hired. (Conifer Memo, p. 7).  To the contrary, as alleged in the Complaint, Mr. Caire began the hiring process with InforMed in August of 2010.  During the hiring process, there was never any mention of arbitration, let alone that it would be a condition of employment. (Complaint, ¶ 73).  On September 9, 2010, Mr. Caire was given a comprehensive offer letter setting forth all of the terms and conditions of employment, which he thereafter signed, accepted and returned.  The offer letter contained no mention of arbitration. (Complaint ¶ 74)(<i>See also</i>, Decl. Caire, Ex. 1, Offer Letter).  It was not until <i>after</i> he appeared for work that Informed foisted an employee manual on

adequate consideration for the arbitration provisions is wrong.  The Maryland Court of Appeals has

unambiguously held that in the case of an employer-employee relationship, "employment or continued

employment does not act as consideration in return for [the employee's] promise to arbitrate." Cheek v.

United Healthcare of Mid-Atlantic, Inc., 835 A.2d 656, 666 (Md. 2003).  *See also*, Shaffer v. ACS Gov't

Services, Inc., 321 F.Supp.2d 682, 686 (D. Md. 2004)("this Court must reject ACS's contention that Mr.

Shaffer's continued employment constituted consideration for entering an arbitration agreement").  As

such, there is no basis in law or fact for Defendants' assertion that Mr. Caire's employment or continued

employment constituted independent consideration upon which to bind him to the arbitration provisions.

     C.     The Arbitration Policy Does Not Mutually Bind Both Parties

     Defendants next allege that there is mutual consideration since "[b]oth parties agreed to be bound

by the arbitration procedure."  (Conifer Memo, p. 12).  This assertion, however, is completely belied by

the simple reading of the arbitration provisions themselves, the language of which is determinative for

purposes of this analysis. *See* Hill v. Peoplesoft USA, Inc., 412 F.3d 540, 543 (4th Cir. 2005)(under

Maryland law, a court determination of "whether an arbitration agreement is a valid contract" is limited

to "the language of the arbitration agreement itself").

     First, under the section titled "Arbitration Policy" in the employee manual, the language reads, in

relevant part:

> "If an employment dispute arises while you are employed at InforMed, the company
> *requests* that you agree to submit any such dispute arising out or your employment…
> exclusively to binding arbitration."

---

him which contained the arbitration provisions. (Complaint ¶ 75).  Hence, there is absolutely no basis for Defendants'
assertion that Mr. Caire's hiring was somehow conditioned upon his acceptance of the Arbitration Policy.

(Conifer Mot., Ex. 1- Arbitration Policy)(emphasis added).  For obvious reasons, the language that InforMed "requests" Mr. Caire to agree to arbitration is by no means a mandate to arbitrate, and, more importantly, does not serve to mutually bind InforMed to the arbitration process for potential claims it might assert against Mr. Caire.  As noted by the Fourth Circuit in Noohi, an arbitration provision which binds only one party to arbitration lacks mutuality of consideration. Noohi v. Toll Bros, Inc., 708 F.3d 599, 610 (4th Cir. 2013).

The only language in the entire Arbitration Policy which could possibly be twisted, contorted and stretched to suggest that mutuality exists is the sentence that reads, in relevant part:

> "This arbitration shall be the exclusive means of resolving any dispute arising out of your employment or termination from employment by InforMed or you, and no other action can be brought by employees in any court or any forum."

(Conifer Mot., Ex. 1).  However, using plain language principals, this sentence states that Mr. Caire is to arbitrate disputes arising out of his employment, including disputes stemming from termination of employment caused by either InforMed or himself.  Further, there is no language of any kind expressly stating that InforMed itself agrees to be bound by the arbitration process for potential claims or disputes it may have against Mr. Caire.  As such, the plain language of this provision does not bind InforMed to arbitration.  In Noohi v. Toll Bros, Inc., 708 F.3d 599, 609-610 (4th Cir. 2013), the defendant made similar assertions that the language of a commercial arbitration agreement was mutual in nature despite the absence of language, as in this case, that both parties were bound to the arbitration process.  Both the district court and the Fourth Circuit concluded that the arbitration language contained no verb pairings relating to the defendants purported obligations to arbitrate, and no express or passive language that defendants itself "agreed" to be bound by arbitration.  The Fourth Circuit concluded that "[t]hese interpretive guides, rooted as they are in reasonable and longstanding grammatical, linguistic and 'plain

20

language' principles, make clear that the provision did not bind [defendant] to arbitration," and thus

lacked mutuality of consideration. <u>Noohi</u>, 708 F.3d at 611. [9]

D.    <u>InforMed's Unilateral Discretion to Alter the Arbitration Policy Renders it Illusory
       and Unenforceable</u>.

Even if Defendants attempt to employ a perverted reading of the arbitration provisions to suggest

that they are equally binding on InforMed, the arbitration provisions further lack consideration because

InforMed, per the language of the provisions and by InforMed's actions, retained the unilateral authority

to change the terms of the arbitration provisions, thus rendering any arbitration agreement illusory.  As

noted above, the arbitration provisions are contained in several locations within InforMed's Employee

Manual.  (Conifer Motion, Ex. 1, Arbitration Policy).  Defendants claim that Mr. Caire agreed to this

policy as evidenced by the fact that he signed a "Receipt and Acknowledgement of [the] InforMed

Employee Manual." (Conifer Motion, Ex. 2, Receipt and Acknowledgment).  However, the Receipt and

Acknowledgment specifically indicates, in relevant part, that:

> "…I have received and read a copy of the InforMed Employee Manual.  **I understand
> that the policies and benefits described in it are subject to change at the sole
> discretion of InforMed at any time**."

<u>Id</u>. (emphasis added).   Put another way, the very documents upon which Defendants rely to establish

acceptance on Mr. Caire's part make clear that InforMed retained the unilateral power to alter or change

their policies, including the "Arbitration Policy" at any time.   On this point, this case is virtually

indistinguishable from <u>Cheek v. United Healthcare of Mid-Atlantic, Inc</u>., 835 A.2d 656 (Md. 2003).

---

[9]    In moving to compel, Defendants cites the Fourth Circuit decisions in <u>Johnson v. Circuit City Stores, Inc.</u>, 148 F.3d 373
(4th Cir. 1998) and <u>O'Neil v. Hilton Head Hospital</u>, 115 F.3d 272 (4th Cir. 1997) for the proposition that where an employer
proffers and arbitration policy, this act "implies" that both parties would be mutually bound to it, as well as consideration in
the form of continued employment. (Conifer Memo, p. 11).  However, both of these cases were decided well before the
seminal decision of the Maryland Court of Appeals in *Cheek*, which was handed down in 2003.

In <u>Cheek</u>, the employee was presented with an offer of employment conditioned on acceptance of the employer's arbitration policy.  Like the present matter, the employer in <u>Cheek</u> retained the unilateral right to "alter, amend, modify or revoke the [p]olicy at its sole and absolute discretion at any time…" <u>Id</u>. at 657-658.  Based on this language, the Maryland Court of Appeals concluded that the employer's unfettered discretion to change the policy rendered the promise to arbitrate illusory, and found it to be unenforceable for lack of consideration. <u>Id</u>. at 659.  Similarly, in <u>Noohi v. Toll Bros, Inc.</u>, 708 F.3d 599 (4th Cir. 2013), the Fourth Circuit, relying on the decision in <u>Cheek</u>, held that the defendants' agreement to arbitrate was also "illusory" and lacked consideration. <u>Noohi</u>, 708 F.3d at 611.  Notably, relying on <u>Noohi</u> and <u>Cheek</u>, the Hon. Catherine Blake of this Court recently struck down a one-sided and onerous arbitration provision for lack of consideration based on these same principles.  <u>Raglani v. Ripken Prof. Baseball</u>, -- F.Supp.2d--, 2013 WL 1633053 (D. Md. April 16, 2013).

By the language in the employee manual and the actions of InforMed, it held the discretion and power to change the terms of the employee manual, including the arbitration provisions.   In all, the holdings in <u>Cheek</u> and <u>Noohi</u> present adverse, controlling authorities which are fatal to Defendants' Motion to Compel Arbitration.

**III.   THE ARBITRATION PROVISIONS AT ISSUE ARE ADDITIONALLY UNENFORCEABLE ON A HOST OF OTHER GROUNDS APART FROM MUTUALITY AND CONSIDERATION.**

A.     <u>Overview</u>

Even if the arbitration policy at issue was enforceable on the basis of mutuality (it is not), there are still several other grounds upon which to declare the entire policy, or parts thereof, unenforceable as a matter of law based on the lack of essential terms necessary for contract formation, as well as procedural and substantive unconscionability.  Arbitration agreements are unenforceable upon such

grounds as exist at law or in equity for the revocation of any contract.  <u>Noohi</u>, 708 F.3d at 606.  Thus, although judicial inquiry is highly circumscribed, it is focused both on ensuring there was adequate contractual formation in the agreement, including valid consideration (addressed in <u>Point II</u>, *supra*), and that the agreement itself is not unfair, unconscionable, or otherwise defective in ensuring the claimant can "effectively… vindicate his or her statutory cause of action in the arbitral forum" <u>Murray v. United Food & Comm. Workers Int'l Union</u>, 289 F.3d 297, 302 (4th Cir. 2002)(*citing* <u>Green Tree Fin. Corp.- Alabama v. Randolph</u>, 531 U.S. 79, 89 (2000)).

      B.    <u>There Has Been No Agreement on the Essential Terms of Arbitration</u>

At the outset, the Court can take notice that unlike almost every other arbitration agreement that becomes the subject of judicial inquiry, the arbitration provisions at issue here do not even specify an arbitrator or ADR provider.  For that matter, the arbitration provisions do not warrant that the arbitrator(s) will be neutral, impartial, familiar with employment disputes or even licensed to practice law.  Further, the arbitration provisions do not contain any procedure to safeguard Mr. Caire's rights to challenge or contest an arbitrator, let alone a mechanism to ensure arbitration will go forward in the event the parties are unable to agree upon the selection of an arbitrator.  Similarly, because no arbitrator or ADR provider has been designated to administer disputes, there are no agreed upon rules governing the arbitration.  Moreover, the Arbitration Policy does not even specify a location for arbitration or the governing law applicable to such proceedings.  And, as noted in <u>Point II</u>, *supra*, there is no independent consideration of any kind.  InforMed's arbitration provisions are wholly lacking in all essential terms.  Hence, in terms of contract formation, the lack of these essential material terms serves to render the arbitration provisions unenforceable.  *See e.g.*, <u>Maslow v. Vanguri</u>, 896 A.2d 408 422 (Md. Ct. Spec.

App. 2006)("an agreement that omits an important term, or is otherwise too vague or indefinite with respect to essential terms, is not enforceable")(citations omitted).

     C.     <u>InforMed's Arbitration Policy is Procedurally Unconscionable</u>

An unconscionable bargain or contract has been defined as characterized by extreme unfairness which is made evident by one parties' lack of meaningful choice, and contractual terms that unreasonably favor the other party.  <u>Walther v. Sovereign Bank</u>, 386 Md. 412, 426 (2005)(citations omitted).  The concept of unconscionability addresses two forms of abuses, including those dealing with procedural deficiencies in the contract formation process, and the second dealing with the substantive contract terms. <u>Id</u>. at 426-427 (citations omitted).  These are commonly referred to as 'procedural' and 'substantive' unconscionability. See <u>Carlson v. General Motors Corp</u>., 883 F.2d 287 (4th Cir. 1989).  Defendants rely heavily on the decision in <u>Walther</u> for the proposition that a party is presumed to have read and understood a document he has signed yet they fail to countenance that the issue of contract of adhesion does not revolve around the signature of the party objecting to its enforcement but whether it is "drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms." <u>Walther</u>, 386 Md. at 430. (internal citations omitted).[10]  Procedural unconscionability "concerns deceptive practices employed at the bargaining table." <u>Doyle v. Fin. Am., LLC</u>., 918 A.2d 1266, 1274 (Md. Ct. Spec. App. 2007).  Courts will look to the bargaining strength of each party, the age and intelligence of the parties, who drafted the contract and whether alterations to the contract would have been permitted. <u>Id</u>.

---

[10]   Notably, the Court in <u>Walther</u> (which involved a commercial arbitration provision in a mortgage loan) did not make a determination that the arbitration provisions at issue constituted a contract of adhesion.  Rather, the Court of Appeals assumed, "*arguendo*," that the provisions were a contract of adhesion and proceeded to consider the issue of substantive unconscionability. <u>Walther</u>, 386 Md. at 431.

In this case, the arbitration provisions in question have all the hallmarks of a contract of adhesion.  There is no dispute that the arbitration provisions were drafted by InforMed, and that Mr. Caire was a low entry-level call center employee with no meaningful bargaining power.  But the context of this case goes far beyond a party with a weaker bargaining position subsequently objecting to an agreement that he allegedly "willingly" signed.  As noted above, Mr. Caire disputes that he voluntarily "accepted" arbitration as a formal condition of being hired. (Conifer Memo, p. 7).  Mr. Caire began the hiring process with InforMed in August of 2010.  During the hiring process, there was never any mention of arbitration, let alone that it would be a condition of employment. (Complaint, ¶ 73).  On September 9, 2010, Mr. Caire was given a *comprehensive* offer letter setting forth all of the terms and conditions of employment, including but not limited to salary, available benefit plans, position, job description, anticipated hours of work, performance reviews, paid time off, profit sharing,  employment classification and other provisions incident to his employment. (Complaint ¶ 74)(*See also*, Decl. Caire, Ex. 1, Offer Letter).

This Court can take notice that the offer letter does <u>not</u> contain a single mention of an arbitration provision.  Mr. Caire thereafter signed, accepted and returned the offer letter. <u>Id</u>.  Justifiably relying on the terms agreed to therein and to the detriment of other opportunities which he may have had, Mr. Caire proceeded to appear for work on October 4, 2010, several weeks later. (Complaint ¶ 12). Mr. Caire was never informed between the signing of his offer letter and his first day of work that he would be asked to execute an arbitration agreement. (Decl. Caire, ¶ 7).  At some time after he appeared for work, InforMed provided him an employee manual and asked him to sign an acknowledgment and receipt.  The arbitration provisions were not a stand-alone conspicuous document, but rather were buried on page 13 and 15 of the employee manual. (Conifer Motion, Ex. 1- Arbitration Policy, p. 13).

Mr. Caire was not afforded the opportunity to review the employee manual at the time he was asked to sign a generic receipt and acknowledgment, and received no training on the policies and provisions in the document. (Complaint ¶ 75). Important here is that Mr. Caire had no choice but to sign the acknowledgments.  Under these circumstances, it should come as no surprise that Mr. Caire did not have the opportunity to either appreciate, comprehend or negotiate the terms of the Arbitration Policy. (Complaint ¶ 77).  Given this background – which Defendants have conveniently omitted in their motion— Mr. Caire submits that he was subjected to the Arbitration Policy under circumstances which amount to adhesion. It is true, of course, that a contract of adhesion does not automatically render the entire arbitration provision as *per se* unconscionable, Walther, 386 Md. at 430, but Mr. Caire certainly has established the first threshold of the inquiry.

D.      InforMed's Arbitration Policy is Substantively Unconscionable

In terms of substantive unconscionability, there are several conflicting, vague and ambiguous provisions in InforMed's arbitration provisions that, collectively, serve to deprive Mr. Caire access to a fair and neutral forum to resolve his disputes. Where an arbitration agreement contains provisions that deny a party access to a neutral, arbitral forum, those provisions serve to make the agreement unenforceable. Muriithi v. Shuttle Express, Inc., 712 F.3d 173, 181 (4th Cir. 2013).

Notwithstanding these failings, a fair reading of the Arbitration Policy reveals that it is decidedly one-side and vests InforMed with almost unfettered control over the entire arbitration process, to include InforMed's purported unilateral right to refuse an arbitral forum, as is evidenced by InforMed's refusal to join in AAA arbitration.  Also, InforMed retained such a high level of unilateral discretion that it went so far as to state in its letter to the AAA, (Conifer Memo, Ex. 4) a series of purported requirements that

are not contained in the arbitration provisions.  What this illustrates is that (i) the arbitration provisions lacked essential terms and (ii) InforMed was not bound to the same restrictions that Mr. Caire was.

Furthermore, InforMed and its agents have egregiously attempted to arrogate for themselves near-unilateral control of the process and even purposely lied to Mr. Caire regarding the time limits for invoking the Arbitration Policy that it now seeks to enforce.

1.      Unconscionable Representations Regarding Time Limits for Arbitration

By way of background, Mr. Caire was terminated on February 1, 2012.[11] (Complaint ¶ 62). Following his termination, Ms. Janet Camp, InforMed's Human Resources Director (Conifer Motion, Aff. Camp, ¶ 2) forwarded a letter to Mr. Caire dated February 2, 2012, inexplicably stating, in part, that:

> You have a right to appeal this termination through our Arbitration Policy as outlined in the InforMed Employee Manual.  However, in order to do so, you must return written notification of your intention to appeal to the Human Resources Department no later than the end of business on Friday, February 17, 2012.

(Decl. Caire, Ex. 3, Letter Janet Camp 2/2/12).

In response to this letter, Mr. Caire forwarded an email to Ms. Camp stating "I do not feel my termination reason on my letter is accurate with the situation. Can you please call me when you get the chance? (Decl. Caire, Ex. 4, Email to Camp 2/5/12).  In response, Ms. Camp again inexplicably replied "As advised in my previous letter, if you wish to appeal your termination, you may do so by writing a letter and sending it to my attention no later than February 17, 2012." (Decl. Caire, Ex. 4, Email from Camp 2/6/12).

---

[11]   Notably, Mr. Caire was terminated *just two days* after undertaking statutorily protected FMLA leave, which Defendants do not dispute. Id. (Conifer Memo, p. 4).

At the risk of stating the obvious, the Arbitration Policy in question does not contain any language concerning an employee's internal right to "appeal" a termination decision.  More importantly, Ms. Camp's repeated misrepresentations that Mr. Caire had to initiate the "Arbitration Policy" not later than February 27, 2012 (a period of just 15 days) is at complete odds with the wording of the policy which permits a terminated employee up to a full calendar year to invoke arbitration.  Ms. Camp's actions in this regard calls into question both her motives and completely obfuscates the intended meaning and application of InforMed's policies which their counsel now asserts is straightforward.  Given that InforMed's policies and practices are, in this regard, completely irreconcilable and a transparent attempt to deprive Mr. Caire of his access to a proper neutral forum, the Court should in the interest of fairness and equity invalidate the Arbitration Policy on this basis alone.

> 2.    Unconscionable Provisions Regarding the Selection of an Arbitrator and Waiver of All Rights for Failing to Respond within Fourteen Days.

In addition to the affirmative misrepresentations made to Mr. Caire regarding of the nature and timing of the Arbitration Policy, this Court can take note that there are an assortment of vague, ambiguous, conflicting[12] and unconscionable language ostensibly concerning the selection of arbitrators, all at Mr. Caire's expense.  For example, the Arbitration Policy requires that Mr. Caire respond "within fourteen (14) calendar days to each communication regarding the selection of an arbitrator."  The policy even ridiculously states that failure to respond to "any communication from InforMed about the

---

[12]    This Court can take notice that the Acknowledgment of the Arbitration Policy signed by Mr. Caire actually contains *different* language than is stated in the Arbitration Policy. (Conifer Motion, Ex. 3- Acknowledgment).  *While the Arbitration Policy requires Mr. Caire to submit a demand for arbitration to InforMed directly, the Acknowledgement instead requires Mr. Caire to submit a demand for arbitration directly to an arbitrator.  (Conifer Motion, Ex. 2, Receipt and Acknowledgement – "…I further agree that, in accordance with InforMed's Arbitration Policy I will submit any dispute… to binding arbitration)(emphasis added).*

arbitration proceedings within fourteen (14) calendar days…" will result in Mr. Caire having "waived any right to raise any claims arising out of the termination of your employment." (Conifer Motion, Ex. 1- Arbitration Policy, p. 13).  Not surprisingly, this requirement is not mutual as InforMed has no similar constraint.  On its face, these limitations are a transparent, onerous and one-sided means upon which InforMed attempts to deprive Mr. Caire of his right to arbitrate his dispute.  This, together with the fact that the Arbitration Policy does not contain any procedure to contest and resolve selections issues, effectively increases InforMed's already significant power over the process.

Insofar as the Arbitration Policy does not specify an arbitrator and contains no process for the selection of one, Mr. Caire, through his counsel, out of excess of caution and as a means to preserve his rights given the one year limitation contained in one of the provisions, filed an arbitration demand with the American Arbitration Association ("AAA"), a global leader in alternative dispute resolution services. (Complaint, ¶ 84).[13]  Within days of this demand, InforMed, through their counsel forwarded a letter to the AAA indicating, in part, that Defendants "do not agree to submit the dispute identified by Brandon Caire to the AAA to arbitrate." (Conifer Motion, Ex. 4, letter dated 2/14/13).[14]  More

---

[13]   Even though he believed the Arbitration Policy to be unenforceable on several bases, Mr. Caire filed the arbitration demand out of an abundance of caution in an attempt to forestall any misguided future assertions that he somehow failed to timely preserve his rights given that the Arbitration Policy imposes an unconscionable one year limitations period. In light of the arguments advanced herein, Mr. Caire continues to maintain that the Arbitration Policy is unenforceable and is unwilling to proceed before an arbitrator.  Defendants failed to take advantage of Mr. Caire's voluntary action and now seek to enforce an unenforceable arbitration provision.

[14]   As noted in the Complaint, Mr. Caire asserts that InforMed's failure to participate in the arbitration once filed—amounts to either a waiver or breach of the Arbitration Policy itself on their part.  Clearly, InforMed is attempting to have it both ways.  The arbitration Acknowledgment required Mr. Caire to initiate arbitration within one year.  Mr. Caire did this to protect his rights.  The irony is that now that Defendants failed to take advantage of Mr. Caire's voluntary submission and refused to participate in an arbitration with the AAA, it now has to defend its indefensible arbitration provisions.  Indeed, Defendants' refusal to participate in an arbitral proceeding due to its insistence that it be given complete control over the selection process when the Arbitration Policy does not even specify an arbitrator cannot support Mr. Caire's position that the arbitration provisions are so skewed and lacking as to render them unenforceable.

importantly, this letter, in all respects, confirms InforMed's position that it retains the sole and ultimate authority to reject or "consent" to an arbitrator, with no process in place to resolve disputes.  Id.  This, in and of itself, is grounds to invalidate the Arbitration Policy.  In <u>Murray v United Food & Comm.</u> <u>Workers Int'l Union</u>, 289 F.3d 297 (4th Cir. 2002), the Fourth Circuit was confronted with an arbitration agreement that contained a one-sided selection procedure.  Recognizing the infirmity of their agreement, the defendant offered to provide a list of neutral arbitrators and abide by the ultimate arbitration decision.  The Court, however, was not swayed, holding that "…We decline to allow [the defendant] to salvage the agreement simply… because it promises to act fairly in future cases." <u>Id</u>. at 304.  *See also* <u>Raglani v. Ripken Prof. Baseball</u>, -- F.Supp.2d--, 2013 WL 1633053 (D. Md. April 16, 2013)("simply promising to provide a list of impartial arbitrators, without providing a mechanism by which the selection of an impartial arbitrator will actually be ensured, in insufficient").

        3.    <u>Unconscionable Allocation of Arbitration Costs</u>

In terms of arbitration fees, costs and expenses, Mr. Caire also takes issues with Defendants suggestion that the Arbitration Policy only requires Mr. Caire to "pay an equal share" of the costs. (Conifer Memo, p. 12).  While the Arbitration Policy states that "[t]he Parties, if any, shall share the costs of the arbitrator and court reporter, equally," it is unclear from this wording how this will be apportioned in practical terms. (Conifer Motion, Ex. 1, Arbitration Policy).  For example, in this case, there are several party Defendants, including Conifer and Janet Camp, who are not even a signatory to the Arbitration Policy.[15]  In the event arbitration were to go forward, the wording of this provision is

---

[15]    In her motion to compel arbitration, Ms. Camp takes the position that even as a non-signatory to the Arbitration Policy, she has grounds upon which to attempt enforcement. (Camp Memo, pp. 15-16).  While Mr. Caire does not necessary agree that Ms. Camp, on an individual basis, has standing to move to compel, he nevertheless anticipates that the FMLA claims

unclear as to whether the costs of arbitration would be shared three ways (between Mr. Caire, Ms. Camp, and Conifer), or is intended to be borne equally between the Plaintiff and all Defendants. Furthermore, as in the case of any arbitration, any party may choose – at their sole election—to employ a court reporter.  However, if Mr. Caire does not elect to use a court reporter and the Defendants do, it would be patently unfair to require him to pay his allocated share of the court reporter fees.  Also, InforMed's Acknowledgement contains differing language from the Arbitration Policy concerning costs. In fact, the Acknowledgment facially requires Mr. Caire to be responsible for "any incidental costs of arbitration." (Conifer Motion, Ex. 3, Acknowledgment).  It is unclear, however, what is intended by the phrase "incidental costs" and how these are to be allocated.

Next, as noted by Defendants, Mr. Caire does, in fact, object to paying costs and fees of arbitration on the basis that it is substantively unconscionable for an individual of his limited means and resources.  The Fourth Circuit recently addressed this issue in Muriithi v. Shuttle Express, Inc., 712 F.3d 173 (4th Cir. 2013).  The Court noted the well settled law that "[a] fee splitting provision can render an arbitration unenforceable if, under the terms of the provision, an aggrieved party must pay arbitration fees and costs 'that are so prohibitive as to effectively deny the employee access to the arbitral forum.'" Id. at 181 (citing Bradford v. Rockwell Semiconductor Sys., Inc., 238 F.3d 549, 554 (4th Cir. 2001)). The issues regarding prohibitive costs are reviewed on a case-by-case basis, focusing on factors that include the (i) fees and costs of arbitration, (ii) the claimant's ability to pay, (iii) the value of the claim and (iv) the difference in costs between arbitration and litigation. Id.  A party who meets this substantial evidentiary burden has established a basis for the invalidation of the arbitration agreement. Id.

---

against her will likely be subsumed in the lawsuit against Conifer.  As such, Mr. Caire agrees that the fate of Ms. Camp's motion to compel should be tied to that of Conifer's motion to compel.

In *Muriithi*, the Fourth Circuit concluded that the plaintiff had not met his substantial burden, particularly as it pertained to the actual costs of arbitration.  Specifically, the plaintiff in *Muriithi* was faulted for not offering any evidence regarding the arbitrator's fees "even though it was within his power to obtain this information…." Id. at 182 (citations omitted).   Mr. Caire asserts that *Muriithi* is readily distinguishable from the present case.  Unlike this case, the parties in *Muriithi* had agreed to submit disputes in arbitration before the AAA.  Id. at 177. Ostensibly, the plaintiffs in *Muriithi* could have contacted the AAA in an attempt to secure an affidavit or declaration concerning the 'likely' costs of arbitration in furtherance of the evidentiary burden but did not.  In the present matter, however, there is no basis of any kind upon which Mr. Caire can probe the likely actual costs to be incurred in arbitration since the Arbitration Policy fails to designate an actual arbitrator or ADR provider, and is altogether silent on the issue.  Absent agreement on the ADR provider, Mr. Caire is obviously unable to probe the likely costs of arbitration without engaging in complete speculation.  Furthermore, as noted above, the specific fee-sharing allocations are vague and undefined, as is the issue of a court reporter and "incidental costs."  Moreover, being that the Arbitration Policy fails to state whether the arbitration will be held before a single arbitrator or a panel of arbitrators, it is a daunting if not impossible task to ascertain the likely monetary value of the arbitrator fees at issue.  When these factors are properly stripped from the analysis, Mr. Caire submits that he can only address the substantive unconscionability of arbitration by addressing his inability to pay and the value of the claim. Id. at 181.  To this end, Mr. Caire submits that during his employment at InforMed, he was a low entry-level CSR earning just $37,000 dollars a year in base salary. (Complaint, ¶ 13).  Given that he was unemployed for over a year since his wrongful termination in February of 2012, the lack of meaningful income has a significant impact on his ability to pay significant hourly fees, administrative overhead and costs of an arbitrator or

panel of arbitrators, as the case may be. (Decl. Caire, ¶ 13).    For the foregoing reasons, Mr. Caire

requests that the Court invalidate these arbitration provisions as substantively unconscionable.

4.    InforMed has Unconscionably Truncated the Statute of Limitations.

Mr. Caire asserts that the provisions of the Arbitration Policy and also substantively

unconscionable in that they impermissibly truncate the amount of time available to bring a claim to one

year following termination at the latest. (Conifer Motion, Ex. 1, Arbitration Policy). In this case, Mr.

Caire raises an assortment of claims which statutorily provide a much longer statute of limitations.  The

FMLA, in particular, has a two year statute of limitations, 29 U.S.C. §2617(c)(1), or three years if the

violation is willful.  29 U.S.C. §2617(c)(2).  Similarly, the Maryland Wage Payment and Collection Law

has a limitations period of just over three years.  Butler v. Visionair, Inc., 385 F.Supp.3d 549, 554 (D.

Md. 2005).

Mr. Caire does acknowledge that the Fourth Circuit has previously held that the limitations

period may be shortened by agreement, so long as the limitations period is not unreasonable. See In re

Cotton Yarn Antitrust Litigation, 505 F.3d 274 (4th Cir. 2007).  However, at least one Court in this

jurisdiction has distinguished *Cotton Yarn* on the basis that the case was controlled by the language of

the Clayton Act, and concluding that a "one-year statutory limitations period is substantively

unconscionable because it imposes an unreasonably strict limitations period on an employee to arbitrate

employment-related statutory claims." Gadson v. Supershuttle Int'l, 2011 WL 1231311 (D. Md.

2011)(attached).  In the interests of full disclosure, the Fourth Circuit did reverse *Gadson* in Muriithi v.

Shuttle Express, Inc., 712 F.3d 173 (4th Cir. 2013).[16]  However, the reversal was primarily on other

---

[16]    Despite the different styling in the captions, these were in fact the same case.

grounds.  Specifically, the Fourth Circuit noted that since the one-year limitation at issue was not

contained in the arbitration clause, but rather in the parties' franchise agreement, the district court did

not have the power to find the limitation was unconscionable. Id. at 184.  In this case, the one-year

limitation period *is* contained within one of the arbitration provisions.  (Conifer Motion, Ex. 1,

Arbitration Policy). As such, the reasoning of the district court in *Gadson* remains sound, and Mr. Caire

asserts that InforMed's attempt to truncate the statute of limitations to just one-third of what is otherwise

statutorily provided is substantively unconscionable.

    5.    Severability

    To the extent that this Court determines that the arbitration provisions reflect the requisite

consideration that should not result in the arbitration provisions being enforceable.  Indeed, due to the

sheer volume of objectionable clauses at issue, Mr. Caire maintains that the arbitration provisions be

stricken in their entirety, a request that is buttressed by the fact that the Arbitration Provision in this case

does not have a "severance" or "savings" clause, meaning that if any part of the provisions are found to

be enforceable, then the entire agreement should be stricken as unenforceable.  The question of

severability turns on whether the offending clause or clauses are merely collateral to the main purpose of

the arbitration agreement, or whether the agreement is permeated by unconscionability. Gadson v.

Supershuttle Int'l, 2011 WL 1231311 (D. Md. 2011)(rev'd on other grounds)(*citing* Davis v. O'Melveny

& Meyers, 485 F.3d 1066 (9th Cir. 2007)).  Given the complete paucity of the essential terms of

Arbitration Policy at issue, Mr. Caire suggests that severance in this case would effectively require a

complete rewrite of the Arbitration Policy, an undertaking that the Court should decline.  *See* Booker v.

Robert Half Int'l, 413 F.3d 77, 84-85 (D.C. Cir. 2005)("[i]f illegality pervades the arbitration agreement

34

such that only a disintegrated fragment would remain after hacking away the unenforceable parts, the

judicial efforts begins to look more like rewriting the contract than fulfilling the intent of the parties").

Overall, the arbitration provisions as drafted by InforMed are critically flawed, lack

consideration and are otherwise  insufficient and do not, therefore, create an enforceable agreement.

IV.   **MR. CAIRE HAS PLED CLAIMS FOR DISABILITY DISCRIMINATION UNDER THE ADA AND MHRS SUFFICIENT TO SURVIVE A MOTION TO DISMISS.**

A.   Overview

Conifer's motion to dismiss Mr. Caire's claims for discriminatory discharge based on disability

under the ADA and MHRS is should be denied.  At the outset, while Conifer styles their motion as one

seeking dismissal for failure to state a claim under FED. R. CIV. P. 12(b)(6), this Court can take note that

almost every single case relied upon by Conifer involved a challenge at the summary judgment stage,

which occurs after the parties have had the opportunity to engage in discovery and develop the record.[17]

This is altogether improper. As Conifer is well aware, at the pleading stage, a challenge under FED. R.

CIV. P 12(b)(6) is only intended to test the legal sufficiency of the Complaint. *See* Republican Party of

N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992)(a motion to dismiss under Rule 12(b)(6) tests the

sufficiency of a complaint… it does not resolve contests surrounding the facts, merits, or the

applicability of defenses).  In fact, the Supreme Court itself has recognized that a complaint in an

employment discrimination lawsuit need not contain specific facts establishing a prima facie case.

---

[17]   The primary cases cited by Conifer include Foremanye v. Bd. of Comm. Coll. Trustees, 956 F.Supp. 574 (D. Md. 1996)(summary judgment analysis); Lewis v. Univ. of Maryland, Baltimore, 2012 WL 5193820 (D. Md. 2012)(summary judgment analysis); Tyndall v. Nat'l Educ. Centers, Inc. of Calif., 31 F.3d 209 (4th Cir. 1994)(summary judgment analysis); Halperin v. Abacus Technology Corp., 128 F.3d 191 (4th Cir. 1997)(summary judgment analysis); Broussard v. Panetta, 2013 WL 45902 (D. Md. 2013)(summary judgment analysis).

Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 508 (2002).  Rather, as with any other claim falling within the purview of Rule 8(a), "to survive a motion to dismiss, the complaint must 'state a plausible claim for relief' that 'permit[s] the court to infer more than a mere possibility of misconduct' based upon 'its judicial experience and common sense.'" Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 132 S.Ct. 1327 (2012).  In the present case, Mr. Caire's Complaint comfortably meets and exceeds this threshold.

> B.    Mr. Caire Has Sufficiently Pled the Elements of a Plausible ADA Discharge Claim

To establish a claim for wrongful discharge under the ADA, a plaintiff must show that "(1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." Haulbrook v. Michelin N. Am., 252 F.3d 696, 702 (4th Cir. 2001).  In moving to dismiss, Conifer does not challenge either the second or third elements for purposes of this analysis.

> 1.    Mr. Caire is an Individual within the ADA's Protected Class

As noted in the Complaint, Mr. Caire is an individual suffering from depression, major depressive disorder and associated conditions which substantially limit one or more of his major life activities. (Complaint, ¶ 17).  Conifer has long been on notice of his disability, and further regarded him as being disabled. (Complaint ¶¶ 19-20).  In moving to dismiss, Conifer does not dispute that Mr. Caire is an individual with a disability within the meaning of the ADA and ADAA.  The ADA defines "disability," in relevant part, as a "physical or mental impairment that substantially limits one of more of the major life activities of such individual[.] 42 U.S.C. § 12102(2)(A). "An impairment is a disability … if it substantially limits the ability of an individual to perform a major life activity." 29 C.F.R. §

1630.2(j)(1)(ii). "Substantially limits" is to "be construed broadly in favor of expansive coverage." It is "not meant to be a demanding standard." Id.   More importantly, "major depressive disorder" falls squarely within this definition. 29 C.F.R. §1630.2(j)(3)(iii).

While Conifer effectively concedes that Mr. Caire was within the ADA's protected class, they nevertheless assert that he was not a "qualified individual with a disability" and seek dismissal on the basis that Mr. Caire was allegedly unable to perform the "essential functions" of his position. Specifically, Conifer asserts that Mr. Caire "cannot work regularly on account of [his] disability." (Conifer Memo, p. 17).  First, Conifer alleges that Mr. Caire could not perform the essential functions of his positions since he had, in fact, taken a brief period of time away from work to address his health issues shortly after being hired in 2010. (Conifer Memo, p. 18).  This argument is wrong.  While Mr. Caire did, in fact, take an approved brief period of time away from work to address his health issues shortly after being hired (Complaint, ¶ 18), he, thereafter, returned to work at InforMed, performed his duties, and was a model employee who met and exceeded the legitimate performance expectations of his CSR position. (Complaint ¶ 16).  To suggest, as Conifer now does, that this brief period of approved time away from work early in his career is proof that they were justified in discharging him well over a year later for the inability to perform his job is disingenuous and belied by its own conduct.

The remainder of Conifer's argument regarding Mr. Caire's alleged inability to work stems from the circumstances surrounding his request for statutorily protected FMLA leave in January of 2012.  By way of background, in the fall of 2011, Mr. Caire experienced the loss of two close family members. This, coupled with hostile and retaliatory treatment by management of InforMed, aggravated and exacerbated his underlying mental health issues to the point where his physician recommended that he seek a brief period of time away from work to address his medical condition. (Complaint, ¶¶ 51-54).  As

a result, in early January of 2012, Mr. Caire approached Ms. Camp (InforMed's Human Resources

Director) and informed her he was applying for FMLA leave and would be seeking between 1 and 1½

weeks of time off, followed by intermittent leave under the FMLA to address his condition. (Complaint

¶ 55).  In the context of applying for FMLA leave, Mr. Caire's physician filled out FMLA paperwork

and a physician's certification which noted, in part, that Mr. Caire in the near future "may" need

inpatient hospitalization and "may" need an extended period of time off work due to illness. (Complaint

¶¶ 56-57). InforMed subsequently approved the FMLA leave and Mr. Caire began using his leave on

January 30, 2012. (Complaint ¶ 59).  InforMed terminated him two days later while on FMLA leave.

(Complaint ¶ 62).

      Based on these facts, Conifer now takes the obtuse position that Mr. Caire was therefore "unable

to attend work on a regular and consistent basis." (Conifer Memo., p. 18).  At the outset, the fact that an

employee invokes his statutory right to seek FMLA to treat a 'serious health condition' does not mean

that the employee (who may also be an individual with a disability under the ADA), therefore, cannot

perform the essential functions of his position.  Were it otherwise, an employer could simply terminate

any disabled employee who sought approved leave.  The problem here is that this is InforMed's actual

belief and why, therefore, it jettisoned Mr. Caire.  Moreover, the issue of an employee's ability to

perform essential functions normally comes into play in cases involving reasonable accommodations,

and Mr. Caire's Complaint is not alleging violations of the ADA based on failure to reasonably

accommodate.  Next, Conifer's entire premise that Mr. Caire would not be able to work on a "regular

and consistent basis" in the future is both speculative and premature.  While it is correct that Mr. Caire's

medical provider indicated that he *may* require an extended period of time away from work, the time for

addressing an employee's inability to work is *after* his approved leave expires and *after* he does, in fact,

demonstrate a real and not a potential inability to perform his job duties, with or without accommodation.[18]  What Conifer fails to apprehend is that its own argument supports Mr. Caire's allegations – that it discriminated against him because of his disability.  Conifer extrapolated from the medical provider's note that Mr. Caire would (not may) take time off and acted on this assumption.  It is this assumption that gives rise to the ADA claim.  Certainly, this argument highlights the very hostility that Mr. Caire alleged InforMed has towards individuals with disabilities. Conifer's motion to dismiss must be denied on this point alone.

> 2.    Mr. Caire has Plausibly Pled that his Discharge Occurred under Circumstances that Raise a Reasonable Inference of Discrimination.

Conifer next asserts Mr. Caire's ADA claim must fail given the lack of "any causal connection between his alleged disability and his termination." (Conifer Memo, p. 19).  Specifically, Conifer suggest that there is no temporal nexus or improper "motives" on Conifer's part since more than "sixteen months" elapsed after InforMed became aware of Mr. Caire's disability and his subsequent discharge. (Conifer Memo., p. 20).  Before even reaching the glaring substantive failures of Conifer's position, it is worth noting that Conifer is, once again, attempting to improperly inject what amounts to a summary judgment standard into their motion to dismiss for failure to state a claim.  The only consideration for the Court at this stage of the proceedings is whether Mr. Caire has pled allegations that

---

[18]   Interestingly, while Conifer suggests that "[t]he facts in this case are similar to those" in Tyndall v. National Education Ctrs, Inc., 31 F.3d 209 (4th Cir. 1994) (Conifer Memo, p. 18), the facts there distinct in many ways from those here.  In Tyndall, which involved a motion for summary judgment, a former employee suffering from lupus brought an ADA claim and an ADA association claim alleging, among other things, that her employer failed to reasonably accommodate her disability.  In Tyndall, the record as developed in discovery revealed that the employer had given the employee reasonable accommodations, including approved leaves of absences, even after the plaintiff had long exhausted all of her accumulated leave.  The Court ultimately concluded that the ADA did not require her employer to restructure her entire work schedule to care for her disabled son. At the risk of stating the obvious, the facts in Tyndall bear no relation to this case.

his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. Haulbrook, *supra*, 252 F.3d at 702.  Mr. Caire's Complaint meets and exceeds this threshold.

As noted above, Mr. Caire is an individual suffering from depression, major depressive disorder and associated conditions which substantially limit one or more of his major life activities. (Complaint, ¶ 17).  Mr. Caire's supervisor and the company's Human Resources Director have long been on notice of his disability, and that he was under the regular treatment of a mental health professional. (Complaint, ¶¶ 19-20).  During his employment, he has missed time due to his disabilities. (Complaint, ¶ 18). In the fall of 2011, Mr. Caire experienced the loss of both of his grandmothers, traumatic events which served to aggravate and exacerbate his underlying health conditions. (Complaint, ¶ 51). Following his return to work after the death of his family member, he informed his supervisor that he would need time away from work to deal with his worsening and disabling conditions. (Complaint, ¶ 54).  At that time, Mr. Caire began to notice a change in change in the way he was being treated by his supervisor and Ms. Camp. (Complaint, ¶ 52). InforMed is vigilant about time off by employees, particularly those servicing their call-center, and does not look favorably upon employees who miss time away from work due to disabilities. (Complaint ¶ 67). In fact, Mr. Caire is aware of a similarly situated employee named Elaine Long who herself had time away from work due to depression and was placed on an adverse employment improvement plan, even though she had a balance of accrued and vested sick leave to use. (Complaint ¶ 68).  In early January of 2012, Mr. Caire approached Ms. Camp and informed her he was applying for FMLA leave and would be seeking between 1 and 1½ weeks of time off, followed by permissible intermittent leave under the FMLA to address his condition. (Complaint ¶ 55).  Mr. Caire's physician subsequently filled out FMLA paperwork and a physician's certification which noted, in part, that Mr. Caire in the near future "may" need inpatient hospitalization and "may" need an extended

period of time off work due to illness. (Complaint ¶¶ 56-57).  Although Mr. Caire began using his

approved leave on January 30, 2012, he was terminated just two days later while on leave. (Complaint

¶¶ 59-62).

In the context of his termination, Mr. Caire learned that InforMed had recently undertaken an

investigation and had concluded that he violated InforMed policy by: (1) not installing a "separate

telephone line" while telecommuting; (2) using a personal voice greeting on his phone line; and (3)

improperly utilizing a portion of his expense allowance for personal use. (Complaint ¶ 63).  In his

Complaint, Mr. Caire has gone to *great* lengths to factually demonstrate that each and every one of these

proffered reasons were altogether untrue and completely belied by InforMed's own policies, procedures

and practices.[19] *See e.g.*, Complaint (Rebutting telephone line Reason ¶¶ 29-32; 40-42, 66); (Rebutting

Voice Mail Reason ¶¶ 43-50, 66); (Rebutting Expense Usage Reason ¶¶ 25-28; 33-35, 66).  Moreover,

in subsequent actions, Mr. Camp and even InforMed's own counsel have since made admissions against

interest that several of the alleged grounds for discharge had no basis. (¶¶ 65, 72).[20]  Given this

background, there can be no meaningful dispute that Mr. Caire has sufficiently pled facts and theories

which support his claims for wrongful discharge under the ADA.  The Supreme Court has itself long

held that "a fact finders disbelief of the reasons put forward by the defendant (particularly if disbelief is

accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case,

suffice to show intentional discrimination. St. Mary's Honor Ctr v. Hicks, 509 U.S. 502, 511

---

[19]   Although certainly not binding on this Court, it is worth noting that at least one other trier of fact with the DLLR
concluded that Mr. Caire "did not commit a transgression of some established rule or policy of the employer" in connection
with his discharge and application for unemployment benefits. (Complaint, ¶ 70).

[20]   InforMed now suggests for the very first time that Mr. Caire was also terminated for alleged "insubordination." (Conifer
Memo, p. 4, fn. 2).  Insubordination, however, was never alleged to be a reason for discharge at the time of his firing or any
time thereafter.   These ever changing reasons for his termination are the quintessential hallmark of pretext.

(1993)("rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate

fact of intentional discrimination, and … upon such rejection, '[n]o additional proof of discrimination is

required." Id. [21]   Also, contrary to Conifer's assertion that there is a "sixteen month" disconnect in

terms of timing (Conifer Memo, pp. 19-20), the temporal nexus between Mr. Caire's request for leave to

address his disabling condition in January of 2012 and his subsequent discharge on February 1, 2012 is

*shockingly* causal.

Finally, this Court should not overlook the fact that Conifer has actually admitted in its

memorandum that the reasons for Mr. Caire's discharge "**are obviously in dispute**." (Conifer Memo, p.

4, fn. 2).  This admission, standing alone, would doom a motion for summary judgment.  The Complaint

has sufficiently pled the requisite elements of an ADA claim and, therefore, this motion must be

denied. [22]

## V.  MR. CAIRE HAS PLED AN INDIVIDUAL FMLA CLAIM AGAINST MS. CAMP SUFFICIENT TO SURVIVE A MOTION TO DISMISS.

This Court should dispense with the challenge raised by Ms. Camp to the single claim pled

against her arising under the FMLA.  Notably, Ms. Camp does not dispute that the FMLA encompasses

claims against individuals, which Courts in this jurisdiction have long recognized. *See e.g*., Knussman v.

State of Maryland, 935 F.Supp. 659, 664 (D. Md. 1996) ("liability of individual defendants in their

---

[21]   *St. Mary's* and its progeny typically arise in either the summary judgment context or at trial, but the rationale remains. Mr. Caire's Complaint has set forth an abundance of facts (and at least one comparator) that serve to undercut InforMed's stated reasons for discharge.  Standing alone, this is sufficient to deny the motion to dismiss.

[22]   In terms of the disability claims arising under the MHRS, Mr. Caire agrees with the cases cited by Conifer noting the similarity of proof and standards between claims involving the ADA and the MHRS. (Conifer, Memo., p. 20).  As such, Mr. Caire incorporates by reference his opposition arguments herein as to the MHRS claims, and requests that they similarly be denied on the same grounds.

individual capacities is not foreclosed under the FMLA).[23]  *See also*, <u>Brock v. Hamad</u>, 867 F.2d 804 (4th

Cir. 1989)(individuals "responsible for complying with the Fair Labor Standards Act" properly sued).

Ms. Camp does not dispute that Mr. Caire somehow failed to assert the requisite factual underpinnings

or elements of an FMLA claim.[24]  Instead, she pins her entire motion on the misguided belief that Mr.

Caire failed to allege that Ms. Camp "exercises supervisory authority over Plaintiff." (Camp Memo, p.

21).

 Ms. Camp's position is undercut by both the interpretive regulations and the facts of the

Complaint itself.  First the applicable regulations make clear that individual liability under the FMLA

does not turn on whether or not the individual served solely in a 'supervisory' capacity with respect to

the employee, but rather whether the individual acts in the interest of an employer with respect to the

employee:

> An "employer" includes any person who acts directly or indirectly in the interest of an
> employer to any of the employer's employees. The definition of "employer" in section
> 3(d) of the Fair Labor Standards Act (FLSA), <u>29 U.S.C. 203(d)</u>, similarly includes any
> person acting directly or indirectly in the interest of an employer in relation to an
> employee. As under the FLSA, individuals such as corporate officers "acting in the
> interest of an employer" are individually liable for any violations of the requirements of
> FMLA.

29 C.F.R. §825.104(d).

 Without limitation, the Complaint in this matter asserts numerous factual allegations that Ms.

Camp was, in fact, acting directly or indirectly in the interests of InforMed in regards to Mr. Caire's

---

[23] This Court has noted that FMLA claims seeking to impose individual liability against employees of *public* agencies
cannot lie.  <u>Sadowski v. U.S. Postal Service</u>, 643 F.Supp.2d 749 (D. Md. 2009).  In the present matter, Ms. Camp is <u>not</u> a
public employee.

[24] In its Motion to Compel, or in the alternative, Motion to Dismiss, Conifer does not seek dismissal of the FMLA claims
raised by Mr. Caire.

FMLA leave and subsequent termination.  First, Ms. Camp was InforMed's Human Resources Director (Conifer Motion, Aff. Camp, ¶ 2), a position of significant authority which reports directly the Chief Executive Officer. (Complaint, ¶ 8). Mr. Caire had a history of reporting his medical issues to Ms. Camp and, in fact, requested and coordinated all aspects of his FMLA leave with Ms. Camp in January of 2012. (Complaint ¶¶ 20, 52, 55-58).  Mr. Caire alleges that Ms. Camp began treating him differently when his medical conditions worsened and he was expected to miss time from work. (Complaint¶ 52). More importantly, the letter terminating Mr. Caire was signed by Ms. Camp, and he thereafter interacted with her via email to challenge the reasons for his termination. (Complaint ¶¶ 62-64).  On February 6, 2012, Ms. Camp forwarded yet another letter to Mr. Caire again explaining the underlying reasons for his termination, and threatened that if he spoke with other employees he would be "subject to legal action" by the company. (Complaint ¶ 65).

Defendants now attempt to downplay Ms. Camp's role and complain that the Complaint fails to allege that Ms. Camp had the stand-alone authority to hire or fire employees. (Camp Memo, p. 21). However, as the party opposing the motion to dismiss, Mr. Caire is certainly entitled to the well founded inference that she had such authority, particularly since Ms. Camp authored and signed his termination letter and interacted with him regarding the reasons for his termination. Furthermore, Defendants conveniently fail to mention that the Complaint alleges that Mr. Caire's supervisor – Ms. Howard—did not agree with the decision to terminate Mr. Caire and informed him of such. (Complaint, ¶ 69).  Once again, this only serves to buttress the overwhelming facts and inferences that Ms. Camp was the decision-maker, or at least played a meaningful role in the process.[25]  In any event, sufficient facts have

---

[25]   If Defendants wish to explore this issue further, then the proper avenue for doing so is through the discovery process.

been raised in the Complaint that Ms. Camp was acting directly or indirectly in the interest of InforMed relative to Mr. Caire's discharge.  This motion must be denied.

## **CONCLUSION**

For the foregoing reasons, Mr. Caire respectfully requests that this Court enter an Order denying Defendants' Motion to Compel Arbitration, or in the alternative, for Summary Judgment (ECF Docket Nos. 10, 11), and further grant Mr. Caire's Motion for Declaratory Judgment as set forth in Count I of the Complaint.

Respectfully Submitted,

_____/s/_____
Ruth Ann Azeredo (MD 16175)
Law Office of Ruth Ann Azeredo, LLC
1997 Annapolis Exchange Parkway
Suite 300
Annapolis, Maryland 21401
Tel. 410-729-0190
Fax. 301-805-4748
Email: ruthazeredo@comcast.net

Date: June 24, 2013