IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRANDON CAIRE,                *

      Plaintiff,            *

        v.                *        Civil Action No. RDB-13-1216

CONIFER VALUE BASED CARE, LLC,  *
et al.,
      Defendants.      *

*    *    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM OPINION

This is an employment discrimination case in which the Plaintiff Brandon Caire asserts claims against Defendants Conifer Value-Based Care, LLC, formerly known as InforMed, LLC[1] ("InforMed"), and InforMed's Director of Human Resources Janet Camp ("Camp") (collectively, "Defendants")[2] for violations of the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.*; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, as amended by the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"); the Maryland Human Relations Act, Md. Code Ann., State Gov't § 20-606; and the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. § 3-501, *et seq.* Pending before this Court are Defendant Janet Camp's Motion To Compel Arbitration or, in the Alternative, To Dismiss for Failure to State a Claim (ECF No. 10) and Defendant Conifer Value-Based Care, LLC's Motion To Compel

---

[1] Defendant Conifer Value-Based Care, LLC is the surviving entity of a 2013 merger between InforMed and another firm. Throughout this Memorandum Opinion, this Court will refer to this Defendant by the name of the entity that employed the Plaintiff—InforMed.

[2] The Plaintiff's claims against Conifer Health Solutions, LLC have been dismissed. *See* Order Granting Voluntary Stip. of Dismissal, ECF No. 20.

Arbitration or, in the Alternative, To Dismiss Counts Three and Four for Failure to State a Claim (ECF No. 11). The parties' submissions have been reviewed and no hearing is necessary.[3] *See* Local Rule 105.6 (D. Md. 2011). For the reasons that follow, Defendants' Motions (ECF Nos. 10 & 11) are DENIED.

<u>BACKGROUND</u>

This Court accepts as true the well-pleaded, non-conclusory factual allegations in the plaintiff's' complaint. *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011). In August of 2010, the Plaintiff Caire applied for employment with InforMed, and on September 9, 2010 received an offer letter setting forth various details of the terms and conditions of employment. Compl. ¶¶ 12, 73-47, ECF No. 1. The offer letter did not refer to arbitration in any way. *Id.* ¶ 73. On October 4, 2010, he began working for InforMed as an entry-level telephone customer service representative at company headquarters in Annapolis, Maryland. *Id.* ¶ 74. On his first day of work, the Plaintiff received an employee handbook, which contained the following arbitration provision:

> If an employment dispute arises while you are employed at InforMed, the company requests that you agree to submit any such dispute arising out of your employment or the termination of your employment (including but not limited to, claims of unlawful termination based on race, sex, age national origin, disability, breach of contract or any other bias prohibited by law) exclusively under the Federal Arbitration Act, 9 U.S.C., Section 1. Similarly, any disputes arising during your employment involving claims of unlawful discrimination or harassment under federal or state statutes shall be submitted exclusively to binding arbitration under the above provisions. This arbitration shall be the exclusive means of resolving any dispute arising out of your employment or termination from employment by InforMed or you, and no other action can be brought by employees in any court or any forum.

---

[3] The Plaintiff filed a Motion for Leave to File Surreply and Memorandum in Support (ECF No. 23), which was unopposed by the Defendants. The Motion for Leave to File Surreply is GRANTED, and this Court has considered the Plaintiff's additional arguments.

By simply accepting or continuing employment with InforMed, you automatically agree that arbitration is the exclusive remedy for all disputes arising out of or related to your employment with InforMed and you agree to waive all rights to a civil court action regarding your employment and the termination of your employment with InforMed; only the arbitrator, and not a judge or jury, will decide the dispute.

If you decide to dispute your termination or any other alleged incident during your employment, including but not limited to unlawful discrimination or harassment, you must deliver a written request for arbitration to InforMed within one (1) year from the date of termination, or one (1) year from the date on which the alleged incident(s) or conduct occurred, and respond within fourteen (14) calendar days to each communication regarding the selection or an arbitrator and the scheduling or a hearing. If InforMed does not receive a written request for arbitration from you within one (1) year, or if you do not respond to any communication from InforMed about the arbitration proceedings within fourteen (14) calendar days, you will have waived any right to raise any claims arising out of the termination of your employment with InforMed, or involving claims of unlawful discrimination or harassment, in arbitration and in any court or other forum.

You and InforMed shall each bear respective costs for legal arbitration at any such arbitration. The parties, if any, shall share the cost of the arbitrator and court reporter, equally.

Pls.' Opp., Decl. of Brandon Caire Ex. 2, ECF No. 18-2 at 10 ("Arbitration Policy"). Caire alleges that he was not given time to read the handbook and further alleges that he did not know it contained an arbitration provision. *Id.* ¶ 75. Nevertheless, the Plaintiff was required to sign a page of the Employee Handbook containing an "Acknowledgment of and Agreement with InforMed Arbitration Policy," which states:

My signature on this document acknowledges I understand the above Arbitration Policy and agree to abide by its conditions. I also acknowledge that I understand my employment is at-will and may be terminated at any time, with or without reason, by either InforMed or myself. I further agree that, in accordance with InforMed's Arbitration Policy I will submit any dispute - including but not limited to my termination - arising under or involving my employment with InforMed to binding arbitration within one (1) year from the date the dispute first arose. I agree that arbitration shall be the

exclusive forum for resolving all disputes arising out of or involving my employment with InforMed or the termination of that employment. I agree I will be entitled to legal representation, at my own cost, during arbitration. I further understand that I will be responsible for half the costs of the arbitrator and any incidental costs of arbitration.

ECF No. 18-2 at 12. This document included signature lines for the employee and a "Designated Manager." *Id.* In addition, the Plaintiff was required to sign a "Receipt and Acknowledgment of InforMed Employee Manual" which contained the following language:

> **Understanding and Acknowledging Receipt of Informed Employee Manual**
> I have received and read a copy of the InforMed Employee Manual. I understand that the policies and benefits described in it are subject to change at the sole discretion of InforMed at any time.
>        * * *
> **Arbitration**
> I also acknowledge that I have read and understand the Arbitration Policy contained in this Employee Manual and I agree to abide by the policy.

ECF No. 18-2 at 13. The Arbitration Policy, the Acknowledgment of and Agreement with InforMed Arbitration Policy, and the Receipt and Acknowledgment of InforMed Employee Manual collectively form the arbitration agreement at issue in this case.

Shortly after beginning work at InforMed, Caire took time off of work to address health issues including Major Depressive Disorder and severe social anxiety disorder. *Id.* ¶¶ 17-18. The Plaintiff's direct supervisor, Kathy Howard, was aware that he was undergoing regular psychiatric treatment, as was InforMed's Human Resources Director, Defendant Camp. *Id.* ¶¶ 19-20. Despite his mental health conditions, between his hiring in October 2010 and May 2011, the Plaintiff met or exceeded the level of performance expected of an on-site telephone customer service representative. *Id.* ¶ 16.

Because telephone customer service representatives are not required to interact face-to-face, InforMed routinely encouraged and allowed employees to telecommute as a cost-

saving measure. *Id.* ¶ 21. In May of 2011, at InforMed's suggestion, the Plaintiff agreed to telecommute from home. *Id.* ¶ 22. The Plaintiff signed a "Staff Employee Telecommuting Request Form" and a "Telecommuting Agreement," and InforMed approved him to begin telecommuting from home effective on or about June 1, 2011. *Id.* ¶¶ 23-24. As a result of the new arrangement, the Plaintiff incurred costs for office supplies and services necessary to work from home. *Id.* ¶¶ 25-27. InforMed paid a flat monthly stipend of $160 to help defray these costs. *Id.* ¶ 28. In setting up his home office, the Plaintiff changed his land line telephone number so that he could use it for work purposes with minimal interruption from personal calls. *Id.* ¶ 29. The Telecommuting Agreement did not require telecommuters to maintain multiple phone lines, and it was common for InforMed's telecommuting employees to use just one phone line for InforMed purposes during business hours and for personal purposes at other times of the day. *Id.* The Plaintiff alleges that Sarah Doty, a customer service representative at InforMed who began telecommuting approximately one month after the Plaintiff, stated that she and "everyone else in our department" had only one phone line and this fact was known to management. *Id.* ¶ 30. However, near the end of the Plaintiff's employment with InforMed, supervisor Ms. Howard sent an email on January 27, 2012 to all telecommuting customer service representatives instructing them, "In the future: Make sure you have a dedicated InforMed line if you are remote and make sure you are not using the InforMed line for personal use." *Id.* ¶¶ 60-61.

Similarly, InforMed permitted "incidental and occasional" use of company equipment by employees for personal reasons with prior manager approval; in practice, no manager approval was required. *Id.* ¶¶ 34-35. In addition, the Plaintiff was not required to maintain

an InforMed greeting on his land line voicemail. *Id.* ¶ 47. InforMed used a self-contained voice mail system, meaning that any time a customer service representative was unavailable to answer a call, the caller would be routed directly to InforMed's company voicemail box. *Id.* ¶ 43. However, in or around the fall of 2011, a malfunction in InforMed's system failed to route calls to the internal voicemail box. *Id.* ¶ 46. This failure caused InforMed calls to be routed to the Plaintiff's personal voicemail greeting from his previous land line, dating to a time before he changed the number to begin telecommuting. *Id.* The Plaintiff contacted his telephone service provider and ensured that no further InforMed-related calls would be routed to a personal voicemail greeting. *Id.* ¶ 49.

During the Plaintiff's employment as a telecommuter from his Maryland home, his grandmother began undergoing cancer treatment. *Id.* ¶ 37. As a result, the Plaintiff requested that he be allowed to telecommute temporarily from his grandparents' home in Louisiana. *Id.* ¶ 38. InforMed agreed and on August 15, 2011 the Plaintiff signed a second Telecommuting Agreement which was substantially identical to the first. *Id.* ¶ 39. To avoid interference between his grandparents' personal telephone calls and InforMed business, the Plaintiff installed a second phone line at his remote office in Louisiana. *Id.* ¶¶ 40-41.

In September 2011, Caire's grandmother in Louisiana, with whom he had been especially close, died. *Id.* ¶ 51. Within a few days, his other grandmother also died. *Id.* These losses were very traumatic and the Plaintiff experienced exacerbated mental health issues. *Id.* The Plaintiff returned to Maryland to resume telecommuting from his home, but his grief led to a worsening of his Major Depressive Disorder and related symptoms. *Id.* ¶ 54. The Plaintiff alleges that upon his return to InforMed, he noticed that his supervisor Ms.

Howard and Defendant Camp treated him differently than they had before. *Id.* ¶ 52.

In January of 2012, the Plaintiff informed Ms. Howard and Defendant Camp that he needed to take between one and one-and-a-half weeks off, followed by intermittent leave, to treat his depression. *Id.* ¶ 55. His Family Medical Leave Act certification noted that he had a "lifelong condition" marked by symptoms of "low mood, anhedonia (inability to experience pleasure), anxiety, depression, crying spells, loss of energy, memory and concentration, as well as irritability, restlessness and difficulty sleeping." *Id.* ¶ 56. The certification indicated that Caire may need inpatient hospitalization, extended time off for follow-up treatment, and fourteen days or more off per month if he experienced an exacerbation of his illness. *Id.* ¶ 57. After considering his FMLA certification and Notice of Eligibility and Rights and Responsibilities, Defendant Camp approved the FMLA leave request on January 14, 2012. *Id.* ¶ 58. The Plaintiff began his FMLA leave period on January 30, 2012. *Id.* ¶ 59. Just two days later, on February 1, 2012, the Plaintiff was terminated.[4] *Id.* ¶ 62.

In the termination letter, the Defendants' stated reasons for terminating the Plaintiff were that he violated the Telecommuting Agreement by failing to install a separate phone line solely for InforMed business, using a personal voicemail greeting for InforMed callers, and using a portion of his expense allowance for his personal phone line. *Id.* ¶ 63. Ms. Howard informed the Plaintiff that she disagreed with the decision to terminate him. *Id.* ¶ 69. The Plaintiff, in an email to Defendant Camp, stated, "I do not feel that my termination

---

[4] The Plaintiff alleges that another InforMed employee, Elaine Long, also missed work because of serious depression and was placed on a performance improvement plan. She was not allowed to miss additional time to treat her depression even though she had accrued sick leave that she was entitled to use. *Id.* ¶ 68.

reason on my letter is accurate with the situation." *Id.* ¶ 64. Defendant Camp forwarded a second letter stating that the primary reason for his termination was that he did not install a second phone line for a five-and-a-half month period while telecommuting. *Id.* ¶ 65. In the second letter, Defendant Camp further stated that if Caire did not cease speaking with InforMed employees, he could be "subject to legal action." *Id.*

After being terminated from InforMed, the Plaintiff applied for unemployment benefits through the Maryland Division of Labor, Licensing and Regulation. *Id.* ¶ 70. InforMed challenged his right to unemployment benefits because he had been terminated for "misconduct." *Id.* On March 23, 2012, a hearing examiner for the Unemployment Insurance Appeals Division determined that Caire had not committed misconduct and "did not commit a transgression of some established rule or policy of the employer." *Id.* The Plaintiff alleges that while working as an InforMed customer service representative, both on-site and telecommuting, he was a model employee who met or exceeded the requirements of the position. *Id.* ¶¶ 16, 36.

The Plaintiff also filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *Id.* ¶ 71. According to the Plaintiff, in filings submitted to the EEOC in August of 2012, the Defendants conceded that the Plaintiff was not required to maintain a separate phone line at his home office for telecommuting. *Id.* ¶ 72.

On January 31, 2013, the Plaintiff initiated arbitration proceedings with the American Arbitration Association ("AAA"). *Id.* ¶ 83. Then, on February 14, 2013, counsel for the Defendants sent letters to the AAA and to the Plaintiff indicating their refusal to arbitrate

before the AAA. *Id.* ¶ 85. InforMed indicated that it did not consent to allow the AAA to administrate the arbitration, did not agree to the AAA's fee structure, and offered to provide a list of retired judges to preside, as well as to review any potential candidates the Plaintiff wished to propose. Opp. Ex. 5, ECF No. 11-6 at 1. The Defendants further proposed that any arbitration proceedings be stayed pending the outcome of the state administrative proceedings related to Caire's disability. *Id.* at 2. The Plaintiff filed this lawsuit on April 24, 2013. The Defendants filed their Motions to Compel Arbitration or, in the alternative, Motions to Dismiss.

## I.   DEFENDANTS' MOTIONS TO COMPEL ARBITRATION

### STANDARD OF REVIEW

This Court has previously noted that "motions to compel arbitration exist in the netherworld between a motion to dismiss and a motion for summary judgment." *Shaffer v. ACS Gov't Servs., Inc.*, 321 F. Supp. 2d 682, 683 (D. Md. 2004). Where, as here, the formation or validity of the arbitration agreement is in dispute, a motion to compel arbitration is treated as one for summary judgment. *Id.* at 684 n.1; *Rose v. New Day Fin., LLC*, 816 F. Supp. 2d 245, 251 (D. Md. 2011). Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary

judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993).

<u>ANALYSIS</u>

The Defendants argue that this action should be dismissed pending arbitration pursuant to a valid and enforceable arbitration agreement. The Plaintiff, however, contends that the arbitration clause is unenforceable and he is therefore entitled to bring this suit before this Court.

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1, *et seq.* requires that "an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* at § 2; *see also Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309 (2013) ("This text reflects the overarching principle that arbitration is a matter of contract." (citing *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. ___ , 130 S. Ct. 2772, 2776 (2010)). The Supreme Court has recently noted that arbitration agreements "may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to

arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 563 U.S. ___ , 131 S. Ct. 1740 (2011) (citing *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (internal quotation marks omitted)). The FAA also requires that a federal court stay any proceedings that present a controversy which the parties have agreed to arbitrate. *Id.* at § 3. Moreover, the FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

Despite this presumption, agreements to arbitrate are fundamentally about private choice. "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). Federal courts have the authority to compel arbitration, but in making that determination this Court is mindful that its role is limited to determining the "question of arbitrability," or the "gateway dispute about whether the parties are bound by a given arbitration clause." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).

The United States Court of Appeals for the Fourth Circuit has held that a litigant can compel arbitration under the FAA if he can demonstrate "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the

defendant to arbitrate the dispute." *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991). "Agreements to arbitrate are construed according to ordinary rules of contract interpretation, as augmented by a federal policy requiring that all ambiguities be resolved in favor of arbitration." *Gadson v. SuperShuttle Int'l*, AW-10-01057, 2011 WL 1231311, at *3 (D. Md. Mar. 30, 2011) (citing *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 710 (4th Cir. 2001)). State contract formation law determines the validity of arbitration agreements. *Concepcion*, 563 U.S. ___ , 131 S. Ct. at 1745-46; *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540 (4th 2005). In Maryland, "the law of the jurisdiction where the contract was made ["*lex loci contractus*"] controls its validity and construction." *Kramer v. Bally's Park Place, Inc.*, 535 A.2d 466, 467 (Md. 1988). As this case involves the issue of the validity of the arbitration agreement and because the contract was entered into by the parties in Maryland, Maryland law governs.

Under Maryland law, an agreement to arbitrate disputes is enforceable if it is a valid contract. *Hill*, 412 F.3d at 543; *see also Cheek v. United Healthcare of the Mid-Atlantic, Inc.*, 835 A.2d 656, 661 (Md. 2003). Moreover, "an arbitration clause is a severable contract which is enforceable independently from the contract as a whole." *Holmes v. Coverall N. Am., Inc.*, 649 A.2d 365, 370 (Md. 1994); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. ___ , 130 S. Ct. 2847, 2858 (2010) (Under "the FAA . . . courts treat an arbitration clause as severable from the contract in which it appears and enforce it according to its terms unless the party resisting arbitration specifically challenges the enforceability of the arbitration clause itself."). To determine the validity of the arbitration agreement, Maryland courts look at the four corners of an arbitration provision. *See Cheek*, 835 A.2d at 664-65; *see also Hill*, 412 F.3d at

543. As with any contract, the arbitration provision must be supported by adequate consideration in order to be valid and enforceable. *See Cheek*, 835 A.2d at 661.[5]

### A. Continued Employment as Consideration

The Plaintiff argues that he cannot be compelled to arbitrate because the arbitration agreement is unenforceable for lack of mutual consideration. The Defendants counter by pointing out that by the terms of the Arbitration Policy, the Plaintiff agreed that his hiring and continued employment constituted consideration for waiving his rights to a civil court action. The Defendants' argument cannot hold water.

As articulated by the Court of Appeals of Maryland in *Cheek*, an arbitration provision must be supported by consideration independent of the underlying contract. 835 A.2d at 667. Employment or continued employment cannot act as consideration for an employee's promise to arbitrate. *Cheek*, 835 A.2d at 669 (rejecting employer's argument that providing employment or continued employment constituted sufficient consideration because it would place the court in the "untenable position of having to go beyond the confines of the arbitration agreement itself and into an analysis of the validity of the larger contract"). The Defendants argue that this case is distinguishable from *Cheek* because the InforMed Arbitration Policy specifically provides that an employee agrees to arbitrate "[b]y simply accepting or continuing employment with InforMed." ECF No. 18-2 at 10. The

---

[5] The United States Court of Appeals for the Fourth Circuit recently held that *Cheek* retains its force and is not preempted by the FAA in light of the Supreme Court's decision in *Concepcion*. *See Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 612 (4th Cir. 2013) ("The Supreme Court has never held that the FAA preempts state law rules requiring that arbitration provisions themselves contain consideration (*i.e.*, that they not be illusory), and it would require a substantial extension of existing precedent to do so here.").

Defendants cannot escape the rule clearly stated in *Cheek* by placing explicit language in the arbitration provision. The Defendants' argument in this regard has specifically been rejected by this Court. *Raglani v. Ripken Professional Baseball*, ___ F. Supp. 2d ___ , 2013 WL 1633053, at *4 (D. Md. Apr. 16, 2013). In *Raglani*, Judge Blake of this Court held that an arbitration clause that by its express language purported to "create a binding legal obligation . . . in consideration of [plaintiff's] hiring for employment or [her] continued employment," was not supported by consideration under *Cheek*. ___ F. Supp. 2d ___ , 2013 WL 1633053, at *4. Indeed, to accept the Defendants' reasoning on this point would compel a finding that consideration exists whenever performance of the contract has occurred. *See Cheek*, 835 A.2d at 664-65. Despite the language of the Arbitration Policy, employment or continued employment was not adequate consideration for the Plaintiff's promise to arbitrate.

## B. A Mutual Promise To Arbitrate

Because continued employment cannot serve as consideration for a promise to arbitrate, this Court must determine whether Defendants have given adequate consideration in the form of a mutual promise to arbitrate. In *Cheek*, Maryland's highest court determined that the mutual exchange of promises to arbitrate disputes represented the necessary consideration in support of an arbitration agreement. 835 A.2d at 665 ("[M]utual promises to arbitrate act as an independently enforceable contract . . . [*i.e.,*] each party has promised to arbitrate disputes arising from an underlying contract, and 'each promise provides consideration for the other.'" (quoting *Holmes*, 649 A.2d at 370)).

In this case, the Plaintiff argues that the Arbitration Policy does not bind the Defendants to arbitrate and therefore there is no mutual agreement. The language of the

Arbitration Policy is one-sided: "the company requests that *you* agree"; "no other action can be brought *by employees*"; "*you* automatically agree"; "*you* agree to waive all your rights." ECF No. 18-2 at 10. Nowhere does the employer agree to be bound by arbitration. *Id.*

The Fourth Circuit's decision in *Noohi v. Toll Brothers, Inc.* addressed this Court's consideration of an arbitration agreement between a prospective home buyer and real estate developer to determine whether the terms sufficiently bound both parties to constitute a mutual promise to arbitrate. 708 F.3d 599 (4th Cir. 2013). The Fourth Circuit affirmed this Court's denial of the defendants' motion to stay the lawsuit pending arbitration, holding that the arbitration provision bound only the plaintiffs, and was thus unenforceable for lack of mutual consideration. 708 F.3d at 611. Specifically, the Fourth Circuit reasoned that "all the subject and verb pairings relate to the buyer's obligations (*i.e.*, buyer agrees, buyer waives, etc.); nowhere does the provision state "Buyer and Seller agree," or the passive "it is agreed," "the provision adds additional procedures that only the buyer must perform prior to initiating arbitration, such as giving the seller written notice of each claim and an opportunity to cure any default," and "all the types of claims given as examples in the provisions are claims that the buyer would bring against the seller." *Id.* at 610. The Fourth Circuit concluded that "longstanding grammatical, linguistic, and 'plain language' principles make clear that the provision did not bind [the real estate developer] to arbitration." *Id.* at 611.[6]

---

[6] The situation presented in *Noohi* is closely analogous to this case, with one significant factual difference. The arbitration clause at issue in *Noohi* made clear that the seller retained the right to sue while the buyer was bound to arbitrate. 708 F.3d at 611 (seller's waiver of right to a court proceeding for any counterclaims expressly contemplated that the seller could bring claims in court but the buyer could not). Although there is no such language in this case, the Arbitration Policy is, at best, ambiguous with regard to the employer's obligation. Therefore, the reasoning articulated in *Noohi* applies. *Id.* at 611 n.6 (explaining that while ambiguity in *scope* is resolved in favor of

As in *Noohi*, the Arbitration Policy in this case contains almost exclusively subject-verb pairings relating to the employee and examples of claims that would only be brought by an employee. Likewise, the Arbitration Policy imposes additional notice requirements on employees to initiate arbitration proceedings. 708 F.3d at 610. The Defendants argue that certain phrases written in the passive voice could be read in isolation to bind both parties. *See, e.g.*, ECF No. 18-2 at 10 ("This arbitration shall be the exclusive means of resolving any dispute arising out of your employment or termination from employment by InforMed or you, and no other action can be brought by an employee in any court or any other forum."). However, "This arbitration" refers to the examples of claims made by the employee in the previous two sentences. *Id.* ("claims of unlawful termination based on race, sex, national origin, disability, breach of contract or any other bias prohibited by law" and "claims of unlawful discrimination or harassment under federal or state statutes"). Moreover, the sentence cited by the Defendants as clearly binding both parties concludes by stating, "and no other action can be brought *by an employee* in any court or any other forum." *Id.* (emphasis added). This second clause makes clear that arbitration is the exclusive avenue for an employee to resolve disputes, but does not bind the employer. The parties' obligations need not be identical for an arbitration agreement to be valid, *Walther*, 872 A.2d at 748, but there must be some mutual promise. *See id.* (enforcing arbitration agreement allowing defendant to litigate certain specific claims instead of arbitrating).

To be sure, when it is clear that both parties are bound there is no need to expressly state that the employer agrees to arbitrate. *O'Neil v. Hilton Head Hosp.*, 115 F.3d 272, 274

---

arbitration, there is no presumption of *validity* in ambiguous agreements). It is noteworthy that the Defendants do not address *Noohi*, or the Plaintiff's arguments based on that case.

(4th Cir. 1997) (holding that although the arbitration clause did not expressly bind the employer, the provision "clearly implied that both the employer and the employee would be bound by the arbitration process"). However, InforMed is not clearly bound in this case. Even if there is any ambiguity as to whether passive phrases in the arbitration agreement serve to bind both parties, "the presumption in favor of arbitration does not apply to questions of an arbitration provision's validity, rather than its scope." *Id.* at 611 n.6 (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, ___ , 130 S. Ct. 2847, 2857-58 (2010)). As a whole, the plain language of the Arbitration Policy serves to bind the employee but not the employer. There is no mutual promise to arbitrate and the agreement is therefore unenforceable for lack of consideration.

### C. Illusory Promise Based on Unfettered Discretion

The Plaintiff also argues that the Arbitration Policy is not supported by mutual consideration because the Defendants, by retaining the right to alter the terms of the arbitration agreement at any time, did not bind themselves to arbitration. Where a party reserves the right to "alter, amend, modify or revoke" an arbitration agreement, the promise to arbitrate is illusory and the arbitration agreement is unenforceable for lack of consideration. *Cheek*, 835 A.2d at 662, 669. An arbitration agreement that binds one party to arbitrate while allowing the other to choose its forum is unsupported by a mutual promise. *See Howard v. King's Crossing, Inc.*, 264 F. App'x. 345, 347 (4th Cir. 2008) (per curiam) (applying *Cheek* to hold that a provision binding buyer but allowing seller to choose to arbitrate or to sue for specific performance or damages was a "nonexistent" promise).

In this case, the Arbitration Policy is contained within the employee handbook. Also

within the employee handbook is the "Receipt and Acknowledgment of InforMed Employee Manual" which states that "the policies and benefits described in it are subject to change at the sole discretion of InforMed at any time." ECF No. 18-2 at 13. The "Receipt" also states that the employee "understand[s] the Arbitration Policy contained in this Employee Manual and [agrees] to abide by the policy." *Id.* Thus, InforMed purports to retain the discretion to arbitrate or not. This is a "nonexistent" promise. *Howard*, 264 F. App'x at 347; *Cheek*, 835 A.2d at 662 (holding that employer who retained discretion to alter arbitration clause at any time made "no real promise at all").

The Defendants argue that unlike in *Cheek*, where the language allowing unfettered discretion to alter or amend the agreement was in the arbitration clause itself, to analyze the Defendants' authority to change the arbitration clause this case would require this Court to improperly look beyond the arbitration provision. *Cheek*, 835 A.2d at 664-65 (emphasizing the narrow scope of a court's review of arbitrability). On this point, this Court has distinguished *Cheek* in cases where an employee handbook and the arbitration provision were separate documents. *See, e.g.*, *Ratliff v. CoStar Realty Information, Inc.*, No. DKC-11-0813, 2011 WL 2680585, at *4 (D. Md. July 7, 2011) ("Here, it is undisputed that the agreement to arbitrate was not a policy or benefit contained in the employee handbook."). The opposite is true of the InforMed employee handbook. The arbitration provision is a policy described in the employee manual, therefore, the clause stating that such a policy is subject to change at the sole discretion of InforMed directly applies to the Arbitration Policy.[7] InforMed's

---

[7] For this reason, this case is also distinguishable from the Fourth Circuit's decision in *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 544 (4th Cir. 2005). In *Hill*, the Fourth Circuit held that where an arbitration clause unambiguously bound both parties, the employer's discretion to change certain

promise to arbitrate is therefore illusory. Indeed, InforMed sought to exercise this discretion by choosing to reject the AAA as the arbitration administrator and only proceed on terms it dictated. The arbitration agreement is void because InforMed made no promise to arbitrate at all.

## D. Unconscionability

The Plaintiff also argues that the Arbitration Policy is unenforceable because it is unconscionable. For a contract to be found void as unconscionable, "Maryland courts require a showing of procedural unconscionability—'one party's lack of meaningful choice' in making the contract—and substantive unconscionability—contract terms that 'unreasonably favor' the more powerful party." *Rose*, 816 F. Supp. 2d at 256 (quoting *Walther*, 872 A.2d at 744).

As to the formation of the agreement, the Plaintiff received an offer letter outlining the terms of employment that did not mention arbitration. On the first day of work, the Plaintiff was given an employee manual that contained the Arbitration Policy within it. The Plaintiff states that he was not allowed time to read the various materials on arbitration before signing them. Under Maryland law, however, a party who signs an agreement is presumed to know its contents and will be bound by them. *Dieng v. Colleg Park Hyundai*, No DKC-09-0068, 2009 WL 2096076, at *5 (D. Md. July 9, 2009) (holding that plaintiffs were bound to an agreement that they "did not have or take the time to read and understand" absent "something more"). Even so, while failing to read a contract before signing it is not

---

separate internal dispute resolution procedures was outside the arbitration clause, and it was error to conclude that there was no mutual promise to arbitrate. *Id.* In this case, InforMed retained the power to alter any provision, including the Arbitration Policy.

by itself grounds to find that entering the contract was procedurally unconscionable, the fact that the Plaintiff was not even allowed to read the terms of arbitration before signing does suggest that he had no meaningful choice in the matter.

In addition to the Plaintiff's lack of opportunity to read the arbitration clause before signing, the arbitration agreement is a contract of adhesion. A contract of adhesion is one that is "drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms." *Walther*, 872 A.2d at 746 (quoting Restatement (Second) of Conflict of Laws § 187, cmt. b). Even if the Plaintiff had read the Arbitration Policy, based on the evidence it is reasonable to conclude that any request to change any of its terms would not have been entertained. *See Rose*, 816 F. Supp. 2d at 257 (finding that a reasonable fact finder could conclude that contracts presented on an as-is, take-it-or-leave-it basis were procedurally unconscionable contracts of adhesion). While the Defendants argue that the Plaintiff never actually requested any changes with regard to the arbitration policy, this fact is of no moment. It would be patently unfair to bind an employee with little or no bargaining power to a contract he was not allowed time to read because he failed to attempt to bargain for a change to the very terms he had not been able to read. There is evidence that this was a contract of adhesion that was entered into in a procedurally unconscionable manner.

As to the substance of the agreement, the Plaintiff argues that the arbitration agreement is unconscionable because it denies him access to a neutral arbitral forum. *Muriithi v. Shuttle Express, Inc.*, 712 F.3d 173, 181 (4th Cir. 2013). In addition to a lack of mutual consideration and InforMed's sole discretion to alter the agreement's terms, the

Arbitration Policy is unconscionable because there is no mechanism for selecting a neutral arbitrator and it states no rules by which the arbitration will proceed. *Raglani*, ___ F. Supp. 2d ___ , 2013 WL 1633053, at *6-7 (holding that an arbitration agreement that allowed employer to choose arbitrator and insufficiently defined rules by which arbitration would be conducted denied employee neutral arbitral forum). Moreover, in response to the Plaintiff's attempt to arbitrate before the AAA, a recognized neutral forum the Defendants made clear that they would only arbitrate on terms they deemed favorable. Together, these additional disparities unreasonably favor the Defendants.[8] Viewing the agreement as a whole, the Arbitration Policy is substantively unconscionable.

### E. Estoppel

Finally, despite the fact that the Plaintiff attempted to arbitrate this dispute before filing suit, he is not estopped from opposing the Defendants' Motions to Compel Arbitration. Equitable estoppel is not available to the Defendants to compel arbitration in this case. The case on which the Defendants primarily rely analyzes the principles of equitable estoppel as it pertains to a non-signatory party's ability to enforce an arbitration clause in a contract. *Wachovia Bank, Nat'l Ass'n v. Schmidt*, 445 F.3d 762, 769-71 (4th Cir. 2006). In this case, the Defendant InforMed is a signatory party to the arbitration agreement, and must rely on the contract itself for enforcement. As discussed, the arbitration agreement is unenforceable. Moreover, by initiating arbitration proceedings with

---

[8] The Plaintiff argues that requiring him to share the cost of the arbitrator and court reporter equally with the employer is substantively unconscionable. In support, the Plaintiff cites only the base salary he earned at InforMed, without evidence of the likely cost of arbitration or an analysis of the value of his claim. The Plaintiff has not shown that costs would be so prohibitive as to deny access to a neutral arbitral forum. *Muriithi*, 712 F.3d at (plaintiff failed to provide evidence that he would incur prohibitive costs in arbitration).

the AAA, the Plaintiff was simply attempting to preserve his rights in the face of the onerous requirements placed upon him by the Arbitration Policy. The Plaintiff gained no benefit, and there was no reliance by or prejudice to either of the Defendants. *Dickerson v. Longoria*, 995 A.2d 721, 742-43 (Md. 2010) ("To assert equitable estoppel, the asserting party must have been misled to his or her injury and have changed his or her position for the worse, having believed and relied on the representations of the party sought to be estopped." (citations, internal quotation marks, and alterations omitted)). To the contrary, the Defendants sought to stay the arbitration process and control any proceedings that would follow. The Defendants' equitable estoppel argument is rejected.

On the whole, "courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* . . . its enforceability or applicability to the dispute is in issue." *Granite Rock Co.*, 561 U.S. at ___ , 130 S. Ct. at 2858 (emphasis in original, citation omitted). Neither condition is met here. Because the arbitration agreement is void and unenforceable, this Court must turn to the substance of the Plaintiff's claims.

## II.    **DEFENDANTS' MOTIONS TO DISMISS**

Defendants argue, in the alternative, that if the arbitration clauses are held not to be valid and enforceable, this Court should dismiss Count II against Defendant Camp[9] and Counts III and IV against Defendant Conifer Value-Based Care, LLC pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

<u>STANDARD OF REVIEW</u>

---

[9] Count II is the only claim against Defendant Camp.

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Supreme Court's opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "require that complaints in civil actions be alleged with greater specificity than previously was required." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). The Supreme Court's decision in *Twombly* articulated "[t]wo working principles" that courts must employ when ruling on Rule 12(b)(6) motions to dismiss. *Iqbal*, 556 U.S. at 678. First, while a court must accept as true all the factual allegations contained in the complaint, legal conclusions drawn from those facts are not afforded such deference. *Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim); *see also Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) ("Although we are constrained to take the facts in the light most favorable to the plaintiff, we need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." (citations, internal quotation marks, and alterations omitted)).

Second, a complaint must be dismissed if it does not allege "a plausible claim for relief." *Id.* at 679. Under the plausibility standard, a complaint must contain "more than

labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Although the plausibility requirement does not impose a "probability requirement," *id.* at 556, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012) ("A complaint need not make a case against a defendant or *forecast evidence* sufficient to *prove* an element of the claim. It need only *allege facts* sufficient to *state* elements of the claim." (emphasis in original) (internal quotation marks and citation omitted)). In short, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. *Iqbal*, 556 U.S. at 679.

ANALYSIS

## A. Defendant Camp's Motion to Dismiss

Defendant Camp moves for dismissal of the Plaintiff's FMLA claim against her in Count II. While conceding that she may be held individually liable under the FMLA,[10] Defendant Camp argues that the Plaintiff cannot state an FMLA claim on the ground that Camp is not an "employer" within the meaning of the statute. 42 U.S.C. § 2611(4)(A)(ii)(I)

---

[10] Whether the FMLA imposes liability on employee supervisors in their individual capacities is an open question in the Fourth Circuit. *Jones v. Sternheimer*, 387 F. App'x 366, 368 (4th Cir. 2010) (per curiam) (vacating district court's summary dismissal of plaintiff's FMLA claim against individual defendants as frivolous without expressing any opinion on the viability of the claim). This Court has recognized that private sector supervisors can be held individually liable under the language of the FMLA. *Reed v. Md., Dep't of Human Resources*, No. ELH-12-472, 2013 WL 489985, at *13 (D. Md. Feb. 7, 2013) ("Congress specifically provided for individual liability in the private sector under § 2611(4)(A)(ii)(I)."). Indeed, a majority of federal courts to address the issue of private supervisor liability have concluded that such liability exists. *See, e.g., Benton v. Belk, Inc.*, No 9:12-766-RMG-BHH, 2012 WL 5381209, at *2 (D.S.C. Sept. 20, 2012), *report & recommendation adopted in full by* 2012 WL 53581335 (D.S.C. Oct. 31, 2012) (noting the majority rule and collecting cases).

("The term "employer"— . . . includes—"any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer.").  In the private sector,[11] a supervisor must have "sufficient responsibility or stature within the [defendant employer] to warrant the imposition of personal liability under the FMLA."  *Benton v. Belk, Inc.*, No 9:12-766-RMG-BHH, 2012 WL 5381209, at *2 (D.S.C. Sept. 20, 2012), *report & recommendation adopted in full by* 2012 WL 53581335 (D.S.C. Oct. 31, 2012) (quoting *Williamson v. Deluxe Fin. Servs., Inc.*, No. 03-2538-KHV, 2005 WL 1593603, at *9 (D. Kan. July 6, 2005)). The relevant inquiry is to what extent the supervisor exerted control over the plaintiff's FMLA rights.  *Benton*, 2012 WL 5381209, at *2 ("[T]he FMLA has been interpreted to impose individual liability on employees of covered private sector employers if the employee exercises an adequate amount of control over the plaintiff's ability to exercise his or her FMLA rights." (quoting *Brown v. CBK*, No. 1:05-1171-T-AN, 2005 WL 3263873, at *2 (W.D. Tenn. Nov. 28, 2005))).

In this case, the Plaintiff alleges that Defendant Camp was InforMed's Director of Human Resources, "a position of significant authority which reports dierectly to InforMed's Chief Executive Officer."  Compl. ¶ 8.  The Plaintiff reported his medical condition to Camp, requested FMLA leave from Camp, submitted the necessary paperwork to Camp, and received approval for leave through an email from Camp.  *Id.* ¶¶ 20, 52, 55-58.  The Plaintiff also alleges that the letter terminating him was signed by Camp, and that in later emails,

---

[11] More debate exists among the circuit courts of appeals, within the Fourth Circuit, and even within this District as to whether there is individual liability in the *public* sector.  *Compare Sadowski v. U.S. Postal Serv.*, 643 F. Supp. 2d 749, 752-57 (D. Md. 2009), *with Reed*, 2013 WL 489985, at *7-14 (D. Md. Feb. 7, 2013).  This is a separate inquiry based largely on principles of statutory interpretation not at issue with regard to individual liability for private sector supervisors.

Camp reiterated the reasons for his termination and stated that he could be subject to legal action if he communicated further with InforMed employees. *Id.* ¶¶ 62-64. As Defendant Camp points out, the Plaintiff does not specifically allege that Camp had the authority to make those decisions. Nevertheless, viewing the facts alleged as true, this Court concludes that a reasonable inference flows from those facts that Defendant Camp had the authority to, and did exercise control over the Plaintiff's FMLA rights and his employment at large. Therefore, the Plaintiff has pled a plausible claim against Defendant Camp in her individual capacity. Accordingly, the Motion to Dismiss Count II against Defendant Camp is denied.

### B. Defendant InforMed's Motion to Dismiss

Defendant InforMed moves to dismiss the Plaintiff's claims for wrongful discharge under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 in Count III and Maryland Code Ann., State Government § 20-601, *et seq.* in Count IV. The Defendant argues that the Plaintiff has failed to state a claim upon which relief can be granted because he is not a "qualified individual with a disability" and there is no causal connection between his disability and his termination.[12]

The ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). Under the ADA, "[t]he term 'qualified individual' means an individual who, with or without accommodation can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). As to Maryland law claims alleging violations of State Government Article § 20-601, *et seq.*, this Court has recognized that the definitions of

---

[12] Defendant InforMed does not appear to contest that the Plaintiff is "disabled" within the meaning of the ADA.

"qualified individual with a disability" under the ADA and the Code of Maryland Regulations § 14.03.02.02(B)(10) are "nearly identical." *Lewis v. Univ. of Md., Balt.*, No. SAG-12-298, 2012 WL 5193820, at *4 n.3 (D. Md. Oct. 18, 2012) ("Maryland courts have used interpretations of the ADA for guidance when the ADA is substantially similar to the Maryland code at issue."(citing *Ridgely v. Montgomery Cnty.*, 883 A.2d 182, 193 (Md. Ct. Spec. App. 2005)). Thus, to prove a disability discrimination claim under either federal or Maryland law, a plaintiff must make the same showing that he is a "qualified individual with a disability."

Defendant InforMed argues that the Plaintiff is not a qualified individual with a disability because he could not "attend work on a regular and consistent basis." ECF No. 11-1 at 18. The Fourth Circuit has noted that "a regular and reliable level of attendance is a necessary element of most jobs." *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994) (citations omitted).[13] The Plaintiff in this case performed the job of customer service representative, both on-site and by telecommuting, for approximately sixteen months, with a period of time away from work to address his health issues shortly after he was hired. Compl. ¶ 18. In January of 2012, the Plaintiff informed InforMed that he would need between one and one-and-a-half weeks of FMLA leave. *Id.* ¶ 55. His FMLA certification indicated that if his condition worsened he may need inpatient care for an extended period followed by possible intermittent leave. *Id.* ¶ 56. While his FMLA authorization speculated that *if* he had further episodes of major depression, he *may* be

---

[13] In *Tyndall*, the Fourth Circuit recognized that attendance may not be required in a job where an employee can work completely from home. 31 F.3d at 213. The Plaintiff in this case, as a telecommuter, did not "attend" work in the traditional sense. Plaintiff Complaint makes clear, however, that he required a period of time where he would perform no work, even from home.

required to miss significant amount of work, the Plaintiff had only missed two days of FMLA-approved time when he was terminated. The Plaintiff had not demonstrated a level of absenteeism that would render him unqualified under the ADA.

The cases cited by Defendant InforMed are inapposite. In *Tyndall*, the plaintiff was an instructor at a career training program for medical assistants. 31 F.3d at 211. She had been absent for more than forty work days in seven months in connection with her own disability and the disability of a dependent. *Id.* at 211-12. The *Tyndall* plaintiff had missed the beginning of two instructional cycles, and when she asked to miss a third, the employer terminated her. *Id.* In *Lewis*, the plaintiff was terminated when she failed to return to her job *at the end* of her FMLA leave period. 2012 WL 5193820, at *2. The plaintiff did not communicate with her employer while on leave as required by the applicable internal policy, and her doctor did not clear her to return to work until weeks after she was terminated. *Id.* Neither situation is factually analogous to this case. In sum, the Plaintiff has alleged adequate facts to state that he was a qualified individual with a disability, *Robertson*, 679 F.3d at 291, and Defendant InforMed's Motion to Dismiss on that basis fails.

InforMed also argues that the Plaintiff has failed to state an ADA claim because he has not sufficiently alleged a causal connection between being disabled and being terminated. A plaintiff alleging wrongful discharge on the basis of disability must prove that his disability was motivating factor for his termination. *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 470 (4th Cir. 1999). In *Baird*, the Fourth Circuit held that although the plaintiff's absenteeism may have played a role in her exclusion from the school choir, her complaint stated adequate

factual allegations that discrimination on the basis of her depression was a motivating factor in the decision. 192 F.3d at 470.

Although the Plaintiff alleges that he first disclosed his disability to InforMed in October of 2010, he was not terminated until February 1, 2012. Thus, the employer's mere knowledge of his disability is inadequate by itself to establish the required causal connection for termination more than a year later. *See Sharma v. Howard Cnty.*, No. JKB-12-2269, 2013 WL 530948, at *6 (D. Md. Feb. 12, 2013) (dismissing ADA claim where plaintiff informed employer of disability in 2008 but was not terminated until 2011). Just before the Plaintiff was terminated, however, InforMed granted the Plaintiff's application for FMLA leave, which contained statements from his health care providers that he may be required to miss significant amounts of time for treatment of his depression. Although InforMed knew of the Plaintiff's depressive disorders almost a year-and-a-half earlier, in the interim, he lost two close family members, and the Plaintiff alleged that InforMed personnel started treating him differently. His subsequent FMLA application contained new information regarding his disability and its severity. Then, InforMed terminated him just two days after the start of his approved FMLA leave period. Based on this close temporal proximity, the Plaintiff has adequately alleged that his disability was a motivating factor in his termination.

In addition, InforMed's proffered reasons for terminating the Plaintiff are inconsistent. The termination letter stated that he was discharged for violating the Telecommuting Agreement because he failed to install a separate business phone line, improperly used his expense allowance to pay for the personal phone line, and used a personal voicemail greeting. The Plaintiff has alleged facts that, if taken as true as they must

be at this stage, cast some doubt on InforMed's true motivation.  Indeed, in its Motion, InforMed states that the Plaintiff was terminated for "failure to follow company protocol, insubordination, and misuse of funds."  ECF No. 11-1 at 4 n.2.  Insubordination was not mentioned by InforMed personnel in any of the communications informing the Plaintiff of the reasons for his termination.  The Plaintiff also alleges that the Defendants admitted to the EEOC that he was not required to have a separate business phone line to telecommute.  InforMed states, "These issues are obviously in dispute, but are not material to the present Motion."  *Id.*  In light of InforMed's equivocation with regard to the reasons for terminating the Plaintiff, this "obvious" dispute is material.  Moreover, the Plaintiff has alleged facts that another employee who had a disability was placed on a performance improvement plan and not allowed to miss work despite having accrued sick leave.  This suggests that disability may have played a role in the Defendants' conduct regarding leave.  Applying the motivating factor standard, the Plaintiff has alleged adequate facts to state a claim under the ADA and Maryland law for discrimination on the basis of disability.  Thus, for foregoing reasons, the Motion to Dismiss Count III and IV as against InforMed is denied.

<u>CONCLUSION</u>

For the reasons stated above, Defendants' Motions (ECF Nos. 10 & 11) are

DENIED.

A separate Order follows.

Dated:  November 8, 2013                                 /s/                      
Richard D. Bennett
United States District Judge